[Crim. No. 1154.   Second Appellate District, Division Two.—May 29, 1925.]

## THE PEOPLE, Respondent, v. JACK BLACK et al., Appellants.

[1] CRIMINAL LAW—BURGLARY WITH EXPLOSIVES—CONFESSIONS—FREE AND VOLUNTARY CHARACTER—CONFLICTING EVIDENCE—PROVINCE OF· TRIAL COURT.—In a prosecution for burglary with explosives, where there is evidence upon which the trial court might justly reach the conclusion that the confessions of the defendants were not free and voluntary, and the court might justly exclude them, but there is also evidence directly to the contrary, the determination of such conflict rests finally in the trial court; and where the trial court rules in favor of the admission of the confessions, it must be assumed on appeal that they were properly admitted.

[2] ID.—ADMISSIBILITY OF CONFESSIONS—CONSIDERATION BY JURY.—In such prosecution, the trial judge must determine, first and as a matter of course, whether the confessions were free and voluntary and whether they are to be heard by the jury, but notwithstanding the settlement of that question, which is merely preliminary and bears solely upon the matter of the admissibility of the confessions, the jury may disregard the view of the trial judge made evident by his permitting the confessions to be heard, and may, as the trier of all final questions of fact in the case, conclude that the confessions were not free and voluntary and may, therefore, refuse to consider them.

[3] ID.—ERRONEOUS THEORY DURING TRIAL—CORRECTION BY INSTRUC- TIONS.—In such prosecution, notwithstanding counsel for defendants joins with the trial judge and the prosecuting attorney in the erroneous assumption that it is the exclusive province of the trial judge to determine whether the confessions of the defendants were free and voluntary, but the court does not acquiesce in defend- ants' motion to exclude the jury during the taking of the tes- timony preliminary to the confessions, where counsel for defendants experiences an eleventh-hour reformation from the sins which he committed during the taking of the evidence and requests the trial judge to instruct the jury to the effect that before that body can consider any confession of the defendants

1. Admissibility of confession in evidence, in general, notes, 18 L. R. A. (N. S.) 772; 50 L. R. A. (N. S.) 1077. See, also, 1 R. C. L. 577.

2. See 1 R. C. L. 578.

3. See 8 Cal. Jur. 348.

as evidence, its members "must believe that such confessions were voluntarily made," and explaining what is meant by the term "voluntarily," the refusal of such instruction is error.

[4] Id.—Admissibility of Confessions—Erroneous Instructions.— In such prosecution, it is likewise error for the trial court to instruct the jury to the effect that the admissibility of such confessions is addressed to sound discretion of the court, and that the questions of whether the confessions of the defendants were freely and voluntarily made, without promise of reward or immunity, or whether they were made under threats, or duress, or violence, are to be passed upon by the court, and that the court has resolved those questions in favor of the admissibility of the confessions.

[5] Id.—Requested Instructions—Waiver of Objection.—A defendant in a criminal case may not object to an instruction which he has asked the judge to give to the jury.

[6] Id.—Corpus Delicti—Confessions.—The *corpus delicti* in every criminal case must be proven by evidence aside from any confession or admission of the defendant.

[7] Id.—Degree of Crime—Verdict—Evidence—Theft of Guns.—In this prosecution for burglary with explosives, in which the jury brought in a verdict of burglary in the first degree, the evidence was insufficient to establish that the building entered was inhabited, or that the burglary was committed in the night-time, or that defendant was armed with a deadly weapon, or that in the commission of the burglary he armed himself with such weapon, or while in the commission of the burglary he assaulted any person; and proof that there were taken from the burglarized premises certain guns or revolvers found therein, and which were not loaded, did not constitute proof that the defendant in the commission of the offense "armed" himself, within the meaning of section 460 of the Penal Code.

[8] Id.—Refusal of Witness to Testify—Inference—Misconduct of Trial Judge.—In this prosecution for burglary, the district attorney, in order to substantiate his theory of the case and to connect the defendants with the crime, having called as a witness a certain person, not one of the defendants but who was under confinement in the county jail, and said witness having refused to answer any questions on the ground that his testimony might incriminate him, although he was kept on the stand for a lengthy quiz with reference to his friendship and association with the defendants, it was error for the trial court to tell the jury that they might draw such inferences "as the case may justify" and as they "desire" from the refusal of said witness to testify.

6.  See 8 Cal. Jur. 167.

[9] ID.—INSTRUCTION PARTIALLY ERRONEOUS—RIGHT TO REFUSE COR-
RECT PORTION.—In such prosecution, the trial court having correctly
refused to give that portion of one of defendants' requested in-
structions seeking to embark the jury upon an inquiry as to whether
a certain witness for the prosecution, but who refused to testify on
the ground that his testimony might incriminate him, was near the
place where the crime was committed, or as to whether he did not
then and there have the same opportunity to commit the crime as
defendants, it was not error to refuse to give the remaining portion
of the requested instruction even though that part was proper.

[10] ID. — MATERIALITY OF ERRORS — APPLICATION OF SECTION 4½,
ARTICLE VI, CONSTITUTION—CONFESSIONS.—When applying the pro-
visions of section 4½ of article VI of the constitution to an entire
cause, the appellate court must direct a reversal when it is unable
to say whether appellants would or would not have been convicted
but for the errors of the trial court; and where the record on
appeal as to the manner in which confessions of the defendants
were obtained is such that the appellate court cannot say what the
jury might have decided if the trial court had submitted to it the
question as to whether said confessions were free and voluntary,
the confessions cannot be considered by the appellate court in de-
termining the effect of other errors of the trial court upon the
disposition of the appeal.

[11] ID.—EVIDENCE—VERDICT—APPEAL—ERRORS WITHOUT PREJUDICE.—
In this prosecution for burglary with explosives under an informa-
tion in three counts, the undisputed evidence as to one of the
counts was such that the appellate court could not say that the
jury could have done otherwise than convict defendants upon that
count, even though the trial court had not committed errors during
the trial of the case and in the instructions to the jury; and, under
such circumstances, the appellate court could not say that such
errors were prejudicial to defendants.

[12] ID.—TRIALS—ERRORS—SAVING GRACE OF CONSTITUTION.—It is im-
proper for state prosecutors or trial judges to try criminal cases
with an eye to the saving grace of section 4½ of article VI of the
state constitution, and all such trials should be conducted as if that
section did not exist.

---

(1) 17 C. J., p. 222, n. 24.    (2) 16 C. J., p. 926, n. 67, p. 927,
n. 69.    (3) 16 C. J., p. 948, n. 90, p. 1003, n. 32.    (4) 16 C. J.,
p. 954, n. 49.    (5) 17 C. J., p. 210, n. 94.    (6) 16 C. J., p. 736, n. 46.
(7) 9 C. J., p. 1076, n. 26.    (8) 16 C. J., p. 540, n. 70.    (9) 16
C. J., p. 1067, n. 90.    (10) 17 C. J., p. 369, n. 6.    (11) 17 C. J.,
p. 368, n. 5.    (12) 17 C. J., p. 368, n. 5.

APPEAL from a judgment of the Superior Court of Los Angeles County. Frank C. Collier, Judge. Reversed in part; affirmed in part.

The facts are stated in the opinion of the court.

Harold Ide Cruzan for Appellants.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General, and J. L. Flynn for Respondent.

WORKS, J.—Defendants were charged with the crime of "burglary with explosives" under an information of three counts. The designated crime is thus defined and denounced: "Any person who, with intent to commit crime, breaks and enters, either by day or by night, any building, whether inhabited or not, and opens or attempts to open any vault, safe or other secure place by use of nitroglycerine, dynamite, gunpowder or any other explosive, shall be deemed guilty of burglary with explosives" (Pen. Code, sec. 464). The first count of the information charges an entry into a store, building, or room of one Solomon, the second count related to an entry into property of a similar character of one Tarter, and the third count charged the offense by way of entry into like premises of one Fares. These several charges will hereafter be referred to, respectively, as the Solomon count, the Tarter count, and the Fares count. Defendants were found guilty as charged under the Solomon and Tarter counts. Upon the Fares count the verdict as to each of the defendants reads that the jury finds him "guilty of burglary, a felony, a lesser offense contained within the charge of burglary with explosives as charged in count three of the information, and find it to be burglary of the first degree." As one of the points made for a reversal of the judgment of conviction renders necessary an examination of the statute defining burglary of the first degree, we here set it forth: "Every burglary of an inhabited dwelling house or building committed in the night-time, and every burglary, whether in the daytime or night-time, committed by a person armed with a deadly weapon, or who while in the commission of such burglary arms himself with a deadly weapon, or who while in the commission of any such burglary as-

saults any person, is burglary of the first degree'' (Pen. Code, sec. 460). The defendants appeal from the whole of the judgment of conviction and from an order of the trial court denying their motion for a new trial.

[1] The trial court received in evidence certain confessions made by appellants. It is contended that these confessions should not have been received, that they were not free and voluntary, in fact, that they were secured through duress and coercion. There was much testimony by appellants, it is true, upon which the trial judge might justly have reached the conclusion that the confessions were not free and voluntary, and he might therefore justly have excluded them, but there was evidence directly to the contrary, and in our opinion the whole question resolves itself into one merely of conflicting evidence, the determination of the result of the conflict resting finally in the trial court. Both appellants testified upon the point. The alleged coercion was said by them to have arisen from the claim by officers of the law that France had committed a murder at Deming in the state of New Mexico, and was being sought for extradition upon a charge in that regard. It was also said that the officers had insisted that Black had knowledge of the Deming affair, or was in some complicity concerning it. France testified: ''I asked them [the officers] if I signed a confession to that job on Spring street [involved in one of the charges here] what would I get out of it. They said they would clear me up on Deming, if I would sign a confession in this one, and I said 'Well, that would be all right with me.' That was all that was said. I gave that statement to keep out of [New] Mexico, that was all.'' Black testified that one of the officers said they had evidence against France in the case at Deming and asked, ''Would you rather go back there and stand trial for murder or take a few years here, and we will have that dropped?'' He also said that one of the officers ''said he would drop that murder charge and they would have it fixed up so it would only be one charge come into court.'' The testimony of both the appellants was controverted by the officers. They admitted that the Deming affair was mentioned in conversations they had with appellants, but they denied that any inducements whatever were held out to appellants in connection with that event. The evidence upon the point being in conflict, it must be

assumed that the confessions were properly admitted (*People* v. *Castello,* 194 Cal. 595 [229 Pac. 855]).

[2] Notwithstanding the fact that the ruling of the trial judge in admitting the confessions must be upheld, there yet remains to be discussed a question of great moment in connection with the same matter. Throughout the trial the judge evinced an incorrect understanding of the respective functions of judge and jury when dealing with evidence touching the question whether confessions are free and voluntary; but upon the heels of this declaration attention must be drawn to the fact that counsel for appellant long labored under the same misapprehension, and encouraged, aided, and abetted the judge in perpetuating it. Before we exhibit the state of the record upon this situation it may be well to state the rule which regulates the respective functions of judge and jury when the question of the admissibility of a confession arises in a criminal case. The judge must determine, first and as a matter of course, whether the confession was free and voluntary and whether, therefore, it is to be heard by the jury. Notwithstanding, however, the settlement of this question, which is merely preliminary and which bears solely upon the matter of the admissibility of the confession, as already indicated, there is yet a function to be exercised by the jury concerning it. In allowing the confession to go to the jury the judge has ruled, it is true, that it was freely and voluntarily made, but the ruling in no way binds the jury. That body, now considering the matter substantively, may disregard the view of the judge made evident by his permitting the confession to be heard, and may, as the trier of all final questions of fact in the case, conclude that the confession was not free and voluntary and may therefore refuse to consider it. We may therefore have this situation when a confession is sought to be used in a criminal prosecution: The judge may decide that the confession was freely and voluntarily made and, if he does, will allow it to be received in evidence; but the jury may, upon the same evidence, determine that it was not so made and may refuse to consider it. Without going into the list of earlier cases on the subject, the rule is sufficiently indicated in *People* v. *Zarate,* 54 Cal. App. 372 [201 Pac. 955], and *People* v. *Fouts,* 61 Cal. App. 242 [214 Pac. 657], in which latter case we said that the jury "is always to de-

termine in the last analysis whether a confession is freely and voluntarily made.''

[3]  We now come to a statement of those portions of the record showing not only the extent to which the trial judge departed from this well-settled rule, but the degree in which appellants aided him in the fault.  Early in the trial the question arose as to the circumstances under which the confessions had been given.  A police officer testified that appellant France had made a statement to him at a certain time and place.  The officer said that the statement was free and voluntary, and that it was not induced by threats or violence or by offers of reward or immunity.  He was next asked to state his conversation with France.  Then the following transpired: ''Mr. Cruzan [of counsel for appellants]: One moment . . . Now in that matter . . . we ask that the statements—that your Honor has the right to take the testimony as to any statements out of the hearing of the jury, to ascertain whether or not they were free and voluntary, and the proper foundation first has to be laid; and we ask . . . that the jury be excluded to take testimony . . . as to any and all purported statements on behalf of the defendants, or on the part of the defendants, so that we can determine right now as to the admissibility of any statements.'' The jury was then excluded, not for the purpose of taking testimony on the question whether France's statement was freely and voluntarily made, but for the consideration of argument upon counsel's request for their exclusion for that purpose.  In the midst of the discussion upon the merits of the request the following occurred: ''Mr. Cruzan: . . . The question as to whether or not any threats or duress or anything of that kind was urged against the defendant is absolutely a matter within the discretion of the trial court.  The Court: I think that is correct.  Mr. Cruzan: The trial court takes the evidence as to the admissibility of the testimony.  The Court: In the absence of the jury? Mr. Cruzan: He can do that, because there is a matter for your Honor to decide, and that is the question that your Honor has to try.  It is an issue of law.  The Court: Well, I would like to see the authorities on that, because I believe that that is a good, sound principle. . . . Mr. Cruzan: . . . That this purported confession was obtained by threatening to take these two boys back to [New] Mexico and try them

for a charge of murder. Now, to bring that out before the jury would be most damaging, . . . it being a matter strictly within the province of the trial court, and the trial court being the only one to pass upon the matter, there is no question about it, that it should be heard out of the presence of the jury. . . . The jury is excluded time and again on motions, in order to give counsel particular latitude to argue points, so that statements that are made do not go in the untrained mind of the juror as evidence. The Court: I do, not think there is any controversy that it is the province of the trial court to determine the admissibility of that confession.''

This last statement of the judge, proper enough when considered alone, was improper when viewed in the light of the context leading up to it. Nevertheless, the district attorney did not come to the relief of the judge, for the following immediately took place: ''Mr. Ryan [deputy district attorney] : If the court please, before your Honor determines that, we are not asking for the admissibility of anything that is particular or certain. We have asked for a conversation; we have not asked for a confession, we have not asked for an admission.'' It had been contended by Mr. Cruzan during the argument that the people had not laid a sufficient foundation for the conversation by merely showing by the statement of the officer that France's statements were free and voluntary and not induced by threats or violence or by promise of immunity or reward. It was said that these statements were but conclusions and that the prosecution must go further and show everything that had transpired between the officers and that defendant so that the judge himself might draw therefrom the proper conclusions. After the remark above quoted from him, Mr. Ryan proceeded with an answer to this argument, contending that the foundation laid by the testimony of the officer was sufficient and that the burden was upon the defense to show specific occurrences tending to prove that France's statements were not free and voluntary. At the end of Mr. Ryan's remarks the judge thus expressed himself: ''The Court: Now, the question to determine is whether or not that should be done in the presence of the jury or out of the hearing of the jury. I personally would welcome a rule that would enable us to exclude it from the jury until the

court has determined whether or not it is admissible; but I do not know whether that is the rule or not.'' Following this statement the district attorney made the following remark: ''Mr. Ryan: It is clear in my mind that this is the testimony that comes within the case. It is not on a question of law, it is a question of fact for the jury to consider.'' Taking the complete record, however, it is evident that the prosecuting officer had not in mind the entire rule governing such a situation as was then under consideration. He evidently did not intend to dispute the view that the question was one solely for the judge. He apparently, judging from the whole record, intended only to insist that the judge could not hear the evidence in the absence of the jury. Surely, nowhere in the record did he state clearly the actual rule on the subject under consideration. Not only he, but counsel for the defendants as well, seem to have been afflicted with the same delusion which possessed the judge. This delusion long persisted, as the sequel will show, and the judge, while holding, with the assent of all concerned, that the evidence preliminary to the receipt in evidence of the confession was for his ear alone, determined that he could not hear that evidence in the absence of the jury and called the body back to the jury-box.

Evidence was then offered by both sides upon the issue whether the confessions of the two appellants were free and voluntary. We must state various occurrences during the taking of the testimony on the subject, for the purpose of showing the continued attitude of the court concerning the question involved, as well as the manner in which the counsel for appellants comported himself toward it. After some testimony had been taken the following occurred: ''Mr. Cruzan: . . . so that the record may be complete, we ask that the examination be conducted in the absence of the jury, it being strictly a matter in the discretion of the trial court, being only for the trial court to pass on. Mr. Ryan: We resist any such contention and refuse to let the witness testify upon *voir dire* if it is not conducted within the presence of the jury. The Court: The motion is denied. Proceed.'' A little later Mr. Cruzan announced that he was about to call one of the defendants to the witness-stand for the sole purpose of testifying to facts bearing on the question whether the confessions were free and voluntary. To

this the court responded that the prosecution would have
the right to cross-examine within the lines laid by the direct
examination. Then this occurred: "Mr. Cruzan: Only as to
the issue of law that we are now trying before your Honor.
The Court: Is there any question about that, gentlemen? If
there is— Mr. Ryan: Yes, the statement that this is an is-
sue of law. This is an issue of fact. The Court: This is an
issue of fact which is for the court, however, and not for the
jury. Mr. Cruzan: It is clearly for the court to determine."
Again, while the same question was yet before the court, it was
contended that one of the defendants had been deprived of
sleep, while in jail, for the purpose of inducing a confession, by
the slamming of a door and by the shooting of plungers and
bolts by means of which the door was secured. It was re-
marked that the door in question was like one leading from
the courtroom. Next, the record shows: "The Court: Mr.
Bryant, will you open the door so I can see out in the pas-
sageway? It is a question of fact I am to pass on and not
the jury, so I will take a view of it. Let the record show
the court has examined or inspected the door to the bridge."
Later, the same question still being under examination, coun-
sel for the defendants insisted upon questioning one of them
in a certain manner. Then: "The Court: You have a right
to do that, . . . but be very cautious about it, because of
the weight I have already told you I will attach to it. Mr.
Cruzan: I would be perfectly willing to let your Honor ex-
amine this witness. The Court: I don't desire to do that.
. . . Proceed. In these matters I feel free to comment, be-
cause it is a matter I am passing on, myself. A Juror: May
we have the defendant turn this way? The Court: This is
a matter only for the court. They asked to have you ex-
cluded entirely, but I felt I could not, under the law. I
am going to pass on the question of fact now being developed,
myself."

Thus speaks this unusual record, upon the subject which now
engrosses our attention, up to the time when the various pro-
posed instructions to the jury were requested by the respec-
tive parties. The district attorney asked no instruction upon
the question which had so long occupied the attention of the
court. The counsel for the defendants, however, experi-
enced an eleventh hour reformation from the sins which he
had committed during the taking of the evidence. He re-

quested the trial judge to give to the jury an instruction
to the effect that before that body could consider any confes-
sion of the defendants as evidence, its members "must be-
lieve that such confessions were voluntarily made," and ex-
plaining what was meant by the term "voluntarily." The
instruction was refused. The refusal was error.

[4] Not only did the trial judge decline to give this
proper instruction, but he charged the jury, of his own
motion, after stating correctly the duty of the body in con-
sidering the confessions: "The whole question as to the ad-
missibility of the confessions is one addressed to the sound
discretion of the court. I think I have stated that two or
three times. Now let me state it again. The whole matter
of whether or not the confessions were properly admissible,
and that is to say whether or not they were voluntarily
made under promise of immunity or reward, whether they
were made under threats or violence, is one to be passed
upon by the court, and if the court had not found that
they were freely and voluntarily made, and were not made
under promise of reward or immunity, and they were not
made under violence, or fear of violence, or threats, they
would not have been read to you in evidence. Therefore
that question is disposed of, as to the question of whether
or not the confessions were properly made, but as to the
truth of what is contained in those confessions, the jury is
the sole judge." The giving of this instruction was error.

The judge, again of his own motion, gave another instruc-
tion upon the same subject: "If any expression of mine has
seemed to indicate an opinion relating to any of these mat-
ters, such an expression must be entirely disregarded by
you with this exception, and that relates to the matters of
the confessions. It is the duty of the court to determine
whether or not the confessions have been freely and vol-
untarily made, without promise of reward or immunity, and
whether or not they were made under threats or duress, and
matters of that character, and the court has determined that
they were made without promise of reward or immunity,
and were not made under duress or threats, and were freely
and voluntarily given, and I have so expressed myself and
do now so express myself." The giving of this instruction
was error.

Upon the state of the record leading up to the requested instruction presented by plaintiff, and to the two instructions given by the court of its own motion, the question naturally arises as to whether appellants may avail themselves of the errors which are above made manifest concerning those matters. There could be but little doubt upon the point if appellants, with the conduct of their counsel as it stands forth upon the record, had not at last presented the requested instruction. **[5]** It is settled by the adjudicated cases that a defendant in a criminal case may not object to an instruction which he has asked the judge to give to the jury. The cases on the point are many, and run, at least, from *People* v. *Lopez,* 59 Cal. 362, to *People* v. *Rodley,* 131 Cal. 240 [63 Pac. 351], and *People* v. *Russell,* 19 Cal. App. 750 [127 Pac. 829], without recourse to later adjudications touching what is evidently a just and proper rule. But for the matter of the requested instruction we should have little difficulty in applying this rule to appellants here, for their counsel was so persistent and cocksure in his attitude that we should feel bound, not alone upon what appears to us as sound reason, but upon authority as well, to determine that his conduct, laying aside his request for the instruction, was equivalent to a demand for a statement to the jury of an assumed rule of law such as was incorporated in the two instructions which the judge gave of his own motion. In a case in which an appellant sought to avail himself of alleged errors by the trial court in denying his challenges of members of the jury for cause, but in which he had not exercised all the peremptory challenges allowed him under the law, it was said that it is a "sound ethical principle that a defendant should not be heard to complain of error the injurious effect of which he has suffered, if at all, only by reason of his acquiescence in or failure to avoid it when he had the means and opportunity to do so" (*People* v. *Winthrop,* 118 Cal. 85 [50 Pac. 390]). In a much later case the same rule was applied to a similar state of facts. There the appellant contended that the trial court had erred in limiting his examination of talesmen on their *voir dire.* He had not exercised all the peremptory challenges to which he was entitled. The supreme court said: "The ensuing situation was, therefore, the result of his own acquiescence, and he cannot complain of it. This

is the settled rule where a challenge for cause has been erroneously overruled. . . . And the reasons on which it is based apply equally to a case like the present . . ." (*People* v. *Tyren,* 179 Cal. 575 [178 Pac. 132]). In a prosecution under a charge of larceny by trick and device, in which the victim was plundered by means of the sale of stock in a corporation about to be organized, a part of whose property was said to be a certain invention, the appellate court said, after disposing of certain points: "The defendant also complains of the ruling of the court in sustaining an objection to appellant's offer to prove that the stock of the company was of some value. Without determining whether or not such evidence was at all pertinent or material in view of the peculiar facts of the case, we do not think the court in its ruling committed any error of which appellant can be heard to complain. Before this offer of testimony occurred, appellant had offered in evidence certain letters from various persons which, though not set forth in the record, seem to have been addressed to appellant, and to have contained statements bearing upon the value of the invention and the like. Upon objection these letters were ruled out, and appellant very properly makes no complaint as to such rulings. When he made his offer, of the ruling out of which he does complain, he did not put his witnesses upon the stand nor ask them any question. They were not shown to have any knowledge of the company or of the value of the so-called invention. Appellant made a somewhat vague and general offer of testimony along certain general lines, and concluded his offer by the statement that 'Your honor has practically ruled on that.' By this statement counsel manifestly referred to the ruling of the court in rejecting the letters that had previously been offered, and we think in so doing really invited the ruling of the court that was thereupon made as to his present offer. The matter was certainly so presented to the court as to convey the idea that the same point was involved as had been ruled on. In this way the action of counsel was well calculated to mislead the court (unintentionally of course) as to the purpose of the offer. The previous ruling was clearly correct; and we think, under the circumstances above detailed as attending the last offer, appellant should not be heard to complain of the ruling which he in effect invited" (*People* v. *Miles,*

19 Cal. App. 223 [125 Pac. 250]). These authorities, although proceeding upon facts utterly different from those which are now before us, seem to establish a rule which, but for the asking of the proposed instruction, would be applicable here. In addition to them, however, there is one case in which the facts are closely similar to those with which we now deal. It was there said: ''When the people offered in evidence the written confession which the defendant was alleged to have made, and the admissions and statements testified to by his fellow-prisoner, the people and the defendant both consented that the preliminary evidence and the argument upon the defendant's objections to the offered evidence should be taken and heard in the absence and without the hearing of the jury. It is now claimed that the order and action of the court, taken in conformity with his consent, was error, and highly injurious to the defendant. It is not necessary to consider whether the action of the court in this matter would have been proper if objected to. It was not objected to at the time, there was no exception taken at the time, and there is nothing to review'' (*People* v. *Evans,* 5 Cal. Unrep. 125 [41 Pac. 444]). Of course, if the trial court here had granted the motion of the appellants for an exclusion of the jury while the testimony preliminary to the confessions was being taken the damage would have been done, as in the case last cited, despite the request for the proposed instruction. This would have settled the question unless, which we do not decide, upon the request for the instruction being made the judge could have submitted the preliminary evidence already heard by him to the jury, together with cautionary instructions designed to remove the effects of his many erroneous remarks.

Here, however, the jury was not excluded. Its members heard the preliminary evidence. At least, we think we cannot assume that they did not hear it, although they were repeatedly told that they were not to consider it. They were interested in what was going on, much more than the ordinary spectators in the courtroom, and must have heard everything that transpired. All that was necessary, therefore, when appellants took their belated attitude and asked for the instruction, was for the judge to submit it, perhaps with a more specific charge directing the jury to consider what they had before been forbidden to consider, thus

removing from their minds the impressions erroneously created by the former attitude of counsel and judge. Such a course would have required care and circumspection, but the result could have been accomplished. Under all the circumstances of the present situation we think the authorities above cited do not apply. We think that in the last analysis appellants did not waive the point they now seek to press. Despite the persistent flounderings of their counsel they finally reached firm ground in the presentation of the requested instruction. They thus gave the judge the opportunity to right himself and they had the right to expect that he would scramble ashore with them. We think they may now justly complain that he did not.

We shall consider, when we come to apply the provisions of section 4½ of article VI of the constitution to the cause as we must, whether the error of the court in refusing the instruction asked by appellants, and giving the two instructions which he read to the jury of his own motion, must result in a reversal of the judgment.

Departing from the judgment of conviction as a whole, attention is now drawn to the judgment of guilt of first degree burglary under the Fares count of the information. It is contended that the trial court erred in instructing the jury that burglary in the first degree is a lesser crime than burglary with explosives and is included within it. It is also insisted that, aside from the confessions of appellants, the evidence failed to establish certain material elements of the *corpus delicti* as to the Fares count. These two points we shall amalgamate and treat as one: Was the evidence sufficient to support the verdict upon the Fares count? As the two points are stated, and as they are argued, they naturally lend themselves to such a treatment.

In considering the single point into which the two questions are thus coalesced we shall pay no attention to the confessions. [6] They are excluded by the very terms of the second specific point made by appellants, if we were considering that point alone, and justly so, for the *corpus delicti* in every criminal case must be proven by evidence aside from any confession or admission of the defendant (*People* v. *Simonsen*, 107 Cal. 346 [40 Pac. 440]; *People* v. *Besold*, 154 Cal. 363 [97 Pac. 871]; *People* v. *Clark*, 70 Cal. App. 531 [233 Pac. 980]). The confessions here are es-

pecially to be omitted from our view because of the instructions given by the trial judge to the jury touching the evidence preliminary to their admission. In depriving the jury of the right to find whether the confessions were free and voluntary, the instructions prevented a final determination of the question whether they were to be considered as evidence, even though they had been read to the jury. And the right of appellants to have the jury pass upon the manner in which the confessions were secured, and thereby to settle the question whether they were to be viewed as proper evidence, was a most substantial one, as we shall discover when we come to consider the effect upon the appeal of section 4½ of article VI of the constitution, for the evidence was such that the trial body might easily have determined that the confessions were not free and voluntary.

[7] Laying aside the confessions, did the evidence uphold the verdict on the Fares count? Taking the definition to be found in section 460 of the Penal Code, it is necessary to a conviction of burglary in the first degree that at least one of the following elements be established by the evidence: 1. The building entered must be inhabited; 2. The burglary must have been committed (A) in the night-time, or (B) at any time by a person (a) armed with a deadly weapon, or (b) who while in the commission of the burglary arms himself with such a weapon, or (c) who while in the commission of the burglary assaults any person. Considering these elements in the order stated, there was no evidence in the present case that the Fares property was inhabited. The record shows that it was a drygoods store and not a dwelling-house, but the word "inhabited" in section 460 modifies or qualifies the word "building," as well as the word "dwelling-house" (*People* v. *Clinton*, 70 Cal. App. 262 [233 Pac. 78]). There was no evidence that the burglary was committed during the night. Fares closed his store between 7 and 8 on a Saturday evening and first went to the place thereafter on the next morning between 10 and 11. The crime was committed some time between these two events, as it was on the Sunday morning visit that it was first discovered that it had been perpetrated. The Saturday and Sunday mentioned were the fifteenth and sixteenth days of March, and on the latter day 10 o'clock A. M. was approximately four hours after sunrise. Further, the

burglarious entry into the premises was effected either by means of a skylight or through the "back door," and not from the street, and there was no evidence to show that the burglars were ever in the front of the store. Only the safe on the premises was "robbed," and there was no showing as to where it was located. For all these reasons we think that *People* v. *Ross,* 61 Cal. App. 61 [214 Pac. 267], is not in point. There was no evidence that the burglars were armed with a deadly weapon when they made their entry into the premises. There was testimony that those who burglarized the place took from the premises certain "guns" or revolvers which they found in the safe in the store. The weapons were not loaded, and without deciding the single question whether an unloaded firearm is a deadly weapon, we are satisfied that the burglars who entered the Fares premises did not "arm" themselves with deadly weapons in the commission of the burglary, as the quoted word is intended by section 460. We think it would be no more correct to say that a burglar arms himself with a deadly weapon when in his burglarizing he steals an unloaded firearm and carries it away as part of his loot, than to say that one commits an assault with a deadly weapon when he points an unloaded firearm at another. This latter the courts refused to say in *People* v. *Sylva,* 143 Cal. 62 [76 Pac. 814], and *People* v. *Montgomery,* 15 Cal. App. 315 [114 Pac. 792]. Considering the last element of section 460 on the Penal Code as its parts are listed above, there was no evidence that the burglars who entered the Fares property made any assault upon any person while in the commission of the burglary. It is manifest, therefore, that the conviction under the Fares count cannot stand.

It was the theory of the prosecution, and there was evidence which tended to show, that the burglarious entry into the Solomon place—a clothing store—was effected by means of a hole which was cut in the floor of a certain room in a hotel which was immediately above the store. [8] The manager of the hotel testified that the room in question had been rented by one Jack Brown—not the Jack Black who is one of the appellants—a day or two before the burglary and that he had retained it until the time of the commission of the crime, or thereafter. The manager also testified that she saw two or three other men about the hotel with

Brown, none of whom she could identify as either of appellants. At the time of the trial Brown was under confinement in the county jail. He was brought into the courtroom in the custody of a deputy sheriff and was placed upon the witness-stand for the purpose of showing that appellants had effected an entrance into the store by means of a hole in the floor and had committed the burglary. Brown was represented by counsel during the time he was on the stand. When he was first sworn his counsel plainly stated to the court that Brown would exercise his constitutional right of refusing to answer questions on the ground that his answers might tend to incriminate him, and on that ground his counsel objected to any questions being asked him. Notwithstanding that fact, and despite the further fact that upon being questioned Brown began at once, upon objections by his counsel, to refuse to answer on the ground stated, the prosecuting attorney kept him on the stand for a lengthy quizzing. At least sixty-three questions were propounded to him, going over the entire assumed story of the commission of the burglary under the Solomon count by appellants. To each of these questions Brown's counsel objected on the ground that an answer might tend to incriminate him; the judge asked him if he refused to answer on that ground, he said that he did, and the objection was sustained. At the conclusion of the attempted examination the court directed the deputy sheriff to return Brown to the county jail.

In the midst of the questioning of Brown, and after he had refused to answer nineteen questions, it was objected upon behalf of appellants that it would be error to continue the examination further, that the continued line of questioning was misconduct upon the part of the district attorney, as that officer had been sufficiently informed that Brown would rely throughout upon his constitutional right to refuse to answer, and that the prosecution had not the right to conduct such a "continuous performance" before the jury. The objection was overruled, but we need not decide whether the ruling was correct, as no point is made concerning it here. We state the circumstance, as well as the other incidents of the attempted examination of Brown, for the purpose of leading up to the discussion of a question which appellants do present. After Brown had been returned to the jail this

occurred, italics being ours: ''Mr. Cruzan: . . . I desire to
ask your Honor to instruct the jury that any questions
asked and the refusal of the witness Brown to answer, should
not be considered by the jury as evidence, or be con-
sidered by them as an admission or confession in any
way prejudicing the rights of these defendants. We ask
your Honor to so instruct the jury they cannot regard
the attempt to elicit information as evidence to be con-
sidered by them, either as going to prove the acts or
commission of any of these counts, or that it can be con-
sidered as an admission or confession or in any way affect-
ing the rights of these defendants. The Court: Well now,
I doubt perhaps whether it is evidence, *but they are entitled
to draw such inferences as to his refusal to testify, as the
case may justify,* it seems to me. Mr. Cruzan: We differ
with your Honor very decidedly on that point, and we request
your Honor to so instruct the jury. The Court: Ladies and
gentlemen of the jury, in the matter of the testimony of
Brown—rather, the lack of testimony—his refusal to testify
on the ground that the various questions might tend to
incriminate him—of course it cannot be regarded there is any
evidence in the case because he has refused to testify on that
particular ground. I think that is about as far as the court
can go, is to instruct you that there is no evidence before
you, because he has refused to testify on the ground it
might incriminate him, which he has a perfect right to do,
under the statute of the state and under the constitution of
the state and of the United States. Proceed. Mr. Cruzan:
Now, so there will be no question, we also ask your Honor to
instruct the jury that the reliance of the witness Brown
upon his constitutional rights cannot be considered as an
admission of guilt against these defendants, Black and
France. The Court: I think that is true. They are not
on the stand, therefore that instruction is very properly
given. Neither Black nor France are on the stand. The
effect of the refusal goes only to the defendant, Brown,
himself, that is to say, he has refused to testify because he
thought that the evidence that he might give in response
to those questions would tend to incriminate him. Mr.
Ryan: The ruling, if your Honor please, does not exclude
the privilege of the jury *as drawing any such proper infer-
ence from the refusal to testify,* either against the defendant

Brown in the other case, or *against these two defendants here; that is a matter wholly and solely in their province.* The Court: *I think that is true. I think you may draw such inferences as you desire,* but it is not to be construed as the refusal of the defendants, because they are not making it, nor are they making the objection. The objection is being made by the witness Brown himself, and his counsel, Mr. Stutzman, who is his counsel independently in the proceeding which is now pending against Mr. Brown. Mr. Cruzan: To which we beg to differ, both with the court and the learned district attorney, and we will cite the statement of the district attorney in his argument as misconduct of the district attorney, and ask that the jury be so instructed. The Court: *The admonition will not be given.*"

We cannot but regard these remarks of the judge, coupled with his refusals to instruct as requested, as exhibiting most damaging error. In an opinion approving an utterance of the district court of appeal the supreme court said: "In addition to what the court of appeal says in its discussion touching the error of the trial court in refusing to give instructions proposed by defendant because of the refusal of any witness to testify, or the failure of any witness to testify for the prosecution, it is to be borne in mind that the argument of the prosecuting attorney against the defendant for the refusal of Zimmer to testify, contained not only a severe arraignment of the defendant, but implication and insinuation that the testimony if given would have been unfavorable to the defendant. . . . It will be remembered that Zimmer refused to testify upon the ground that his testimony would incriminate, not Glass, but himself. Says the Supreme Court of the United States [really the United States circuit court] : 'No inference should have been permitted to be drawn against the defendant because of the assertion by the witness of this right to protect himself. He was called by the government. If he had testified, his testimony might have been in favor of the defendant, though criminating himself. It might have entirely exonerated the defendant. To infer that the very opposite would have been or might have been the effect of his testimony, had it been given, was unwarranted' " (*People* v. *Glass,* 158 Cal. 665 [112 Pac. 297]). The extent to which this rule was violated in the present instance, and the extent to which the error

must have influenced the minds of the members of the jury, will be apparent from an additional review of the circumstances which have already been stated. It was made evident to the jury that Brown was in the toils of the law upon some charge the nature of which was not disclosed. While we are not called upon to decide whether the district attorney was guilty of misconduct in questioning him so persistently, or whether the trial court committed error in not halting the attempted examination when objection was made, and have made no examination whatever into either of those questions, it is apparent that the questioning was so conducted as to make a deep impression on the jury. This statement is justified, especially, when the nature of the questions propounded to Brown is disclosed. Laying aside all interrogatories which were pressed upon him before objection was made to a further prolongation of the attempted examination, we quote a few of those which were propounded after that event: ''I will ask you whether or not you and the defendants, Black and France, ever made a diagram of the Solomon clothing store in this city? . . . Over how long a period of time, Mr. Brown, have you known the defendant Black?'' The same question was then asked as to France. Further questions: ''I will ask you whether or not on [the date of the burglary] if you were in the presence of these two defendants, Black and France, and saw the defendants, Black and France, bore a hole from [the room in the hotel] into the clothing store of Mr. Solomon . . . ? . . . I will ask you whether, on [the date of the burglary] . . . in front of the Solomon clothing store, if you acted as what is called, what is commonly known, as a lookout, while the defendants Black and France were inside of the store of Solomon?'' Other questions of a damaging character, and especially many questions asked for the purpose of showing an intimate friendship and association between Brown and Black and France, were put to the unwilling and recalcitrant witness.

Under all these striking circumstances the trial judge, after a presentation to him in the most direct manner of the questions involved in the situation, told the jury that ''they are entitled to draw such inferences as to his refusal to testify, as the case may justify.'' Then the district attorney made the erroneous statement to the effect that the jury

73 Cal. App.—3

might draw ''proper inference'' from Brown's refusal to
testify ''against these two defendants here; that is a matter
wholly and solely in their province.'' To this the judge
responded: ''I think that is true. I think you may draw
such inferences as you desire.'' When Mr. Cruzan asked
that the jury be instructed that the remark of the district
attorney was erroneous the judge ruled: ''The admonition
will not be given.'' The remarks of the judge as to the
drawing of inferences from Brown's refusal to testify, and
those of the district attorney in which he concurred, were
very general, it is true. We know, however, of no inference
whatever which the jury might properly have drawn from
that circumstance as against appellants. Moreover, a part
of the vice in the judge's statements lay in their very gen-
eral character. To tell the jury that they might draw such
inferences ''as the case may justify'' and ''as you desire''
was to say to them that the members of that body might
make an unbridled excursion into a field of riotous specu-
lation concerning the guilt or innocence of appellants. So
far as this particular question was concerned, they were left,
absolutely untethered, to pasture themselves at will upon
such succulent surmise as might suit their fancy. The
result of the errors of the trial court in this regard will
be considered when we come to contemplate the effect of sec-
tion 4½ of article VI of the constitution.

[9] The trial court was asked to instruct the jury ''that
in determining the question as to whether the evidence does
point as strongly to the guilt of the witness Brown testified
to by the witnesses, as it does to the prisoners at the bar,
it is competent for the jury, and, in fact, they should take
into consideration the fact, if proven in the case, that about
the time of the commission of the crime as charged, the said
Brown was near the place where the crime was committed;
and also consider whether one [he] did not then and there have
the same opportunity to commit such crime as the defendants
did''; and ''that, before they can convict the defendants in
this case, it must appear from the evidence beyond a reason-
able doubt that the defendants and not somebody else com-
mitted the offense charged in the information. It is not
sufficient that the evidence shows that the defendants or
somebody else committed the crime, nor that the probabilities
are that the defendants and not somebody else committed

the crime, and unless those probabilities are so strong as to remove all reasonable doubt of the innocence of the defendants, and that there is no other hypothesis than that of guilt of the defendants, then you must acquit them.'' This matter was all included in a single instruction, which the court refused to give. It is insisted that the refusal was error. Even, however, if there was some matter in the instruction which was proper, a point which we do not decide, there were parts of it which were not proper. It was incorrect to seek to embark the jury upon an inquiry as to whether ''Brown was near the place where the crime was committed,'' or as to whether '' [he] did not then and there have the same opportunity to commit such crime as the defendants did.'' The refusal of the instruction was not error. If an instruction is not correct in its entirety exactly as requested. the action of the trial court in rejecting the whole will be affirmed (*People* v. *Lips,* 59 Cal. App. 381 [211 Pac. 22]).

Other points are made by appellants, but they do not merit a special consideration.

We are now to inquire what is to be the result of the errors of the trial court upon the disposition of the appeal under the provisions of section 4½ of article VI of the constitution, to the effect that a reversal of a judgment shall not follow where error is asserted ''unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'' As is our duty, we have complied with the provision of the section requiring an examination of the entire cause now before us, including the evidence. Before we take up a consideration of the constitutional provision as applied to the evidence in the record as a whole, and attempt to admeasure the general effect of the errors committed, it seems necessary to pay regard to a special feature of the cause. The vast bulk of the evidence against appellants, upon the score of weight, was in the confessions. Can we say that there has not been a miscarriage of justice in the one particular disclosed by the error of the court in excluding from the jury the evidence upon the question whether the confessions were freely and voluntarily made? Can we say that the jury would have been bound under the evidence to reach the same conclusion upon that point as was arrived at by the judge? Can we

say that they possibly would not have arrived at that conclusion, upon a just consideration of the evidence upon the subject which is unfolded to us from the cold record? We have stated at the outset of this opinion the general features of the evidence touching the manner in which the confessions were procured, and it becomes necessary now to recur to that subject. The testimony of appellants concerning the alleged successful attempt of the police to coerce them into the making of a confession by means of the story of an assumed murder at Deming, New Mexico, was direct, clear, and positive. Judging from the only source of information open to us, the typewritten record of the evidence, it was not inherently incredible. Far from it. As parts of the story, it is to be especially noted that appellants both testified that they had been at Deming, and at the same time, although they had not arrived there together. France testified that he and some other men had "stolen" a ride on a train going toward Deming, that just before that place was reached an altercation was had between these men, including France, and a brakeman on the train, who insisted that each of the men pay him five dollars or be put off, that during the row the brakeman struck France and blackened one of his eyes, and that one of the other men in the party felled the brakeman by a blow on the head with a coupling-pin. Both appellants testified that the charge of murder alleged to have been mentioned by the police arose out of the killing of a brakeman. The writer of this opinion has at this moment concluded a third perusal of the testimony of both appellants upon this subject, and it must be remarked that the two stories taken together, so far as we are able to determine from the record alone and without a view of the witnesses, bear inherent marks of credibility. Some of the testimony of the police officers is opposed to the joint story, but a part of that testimony furnishes much that the jury might justly have regarded as corroborative of it. As already remarked, the officers, while admitting that the Deming affair was mentioned to appellants, denied that it was employed as a means of coercing a confession. In view of this state of the record we shall recite some particular portions of the testimony of the officers. There were principally two, Officers P. and K., one or the other of whom appears to have been present at all times when appellants were questioned, although a sergeant

of police who was with them for a few moments on several
occasions also testified that no coercion was used in his
presence. The interviews took place in a room in the city
jail which is designated in the record as the "Crime Crush-
ers' Office," appellants being taken there from their cells
from time to time for separate examination. The first cir-
cumstance we shall now note relates to the number of offi-
cers who attended upon appellants at these interviews.
Speaking of a session with Black on the evening of the day
of his arrest—he having been apprehended the day before
France—Officer P. testified that "the officers who were
working on the case at the time, and I am sure that each
and every one of those, which I could name, were in and
out of there during that time." A few pages later in the
record he named five of these officers, in addition to him-
self, and added, "and there were several others that were
picking up different angles of the case that were in and
out of the office." The sergeant testified that on one oc-
casion when France was being questioned there were present
six members of the police force, all of whom he named, in
addition to himself. Speaking of France, again, the ser-
geant said: "There was a dozen of us questioned him, to
some extent." Upon the head of the length of time that was
expended in interviews with appellants the record is equally
remarkable. Officer P. testified that he talked with Black
two or three times on the day intervening between the time
of his arrest and the apprehension of France. Officer K.
said that he and Officer P. talked with the two appellants
the greater part of two days. Officer K. also said concern-
ing one of appellants, apparently Black, "I talked with him
all the way from the time of the arrest until the time he was
locked up"; and that, after his incarceration, "I talked to
him every day almost until the day he was arraigned and
sent to the county jail." We come now to a mention of the
testimony of the officers concerning the Deming episode.
Officer P. testified that knowledge of this affair came from a
certain woman who was an associate of appellants. He said:
"She disclosed the fact to me that Homer France had told
her that he had gotten into trouble coming out here from a
southern state. I don't recall whether it was New Mexico
or Arizona." This was part of an answer to the question:
"Let us know what was said about this murder in New

Mexico.'' After two or three other questions Officer P. testified that "these talks [about the alleged murder] were after the arrest of Homer France. I asked them regarding the murder of the brakeman, if such did take place. They stated that it didn't take place. Homer France was the one of the two which was implicated, when stated to me that one of them had a little trouble with a brakeman, so my questions pointed to him. He stated that he had a fight —no, I will withdraw that—that was two other boys riding in a gondola car with Homer France. That is the way it was in his answer to me, and that one of those boys hit the brakeman in the head with a coupling pin, and the brakeman fell to the bottom of the gondola car, and he further stated that the two boys robbed the brakeman of the money that the brakeman had in his pockets, and that he left the gondola car and got off, if I recall correctly, at the next stop.'' In testifying about a conversation with Black, the same officer said: "To my knowledge, there was never anything said to Jack Black regarding a charge—I will withdraw that answer—will you read the question? (Question read.) The only time I can recall that charging him with the murder of a brakeman was mentioned was—I don't recall anything like that in those words. Q. Well, what was said about the murder of a brakeman? A. Nothing was said about the murder of a brakeman. I recall asking him if he had murdered a brakeman.'' He testified further about a conversation with Black: "Did you tell him a brakeman had been killed down there in a fight? A. No, sir. Q. Did you say anything about anybody getting a black eye? . . . A. I believe I asked him if it was not a fact that Homer France did receive a black eye during that altercation I referred to.'' Officer K. said in answer to a question concerning the Deming affair: "I heard it mentioned, yes. I said nothing about it.''

[10] It is a law that, when applying the provisions of section 4½ of article VI of the constitution to an entire cause, we must direct a reversal when we are unable to say "whether appellant would or would not have been convicted but for the errors of the court'' (*People* v. *Degnen,* 70 Cal. App. 567 [234 Pac. 129]). The same rule is susceptible of an application to the special feature of the present cause which is now under consideration. Can we

say whether or not the jury would have decided that the confessions were to be considered if its members had been permitted to pass upon the question whether they were freely and voluntarily made? We certainly cannot say that. We must assume that the members of the jury were in possession of the knowledge that the iniquity known as the "third degree" is stalking rampant throughout the land, in flagrant violation of human rights which are supposed to be secured by American constitutions, both state and national. This is a knowledge that is possessed by everybody, to the shame of the police organizations of the country. What evidence might the jury have seen in this cause, if its members had been permitted to exercise their functions, that appellants had been the victims of the nefarious practice? Why were appellants so thoroughly surrounded by the minions of the law? Why were they subjected to such lengthy "examinations"? Why was the Deming episode mentioned to them at all? In these circumstances would the jury have found, if it had been given the opportunity, that the police officers were merely attuning their ears to voluntary statements which they hoped might fall from the lips of appellants, or would it have found that the evidence disclosed one of those illicit inquisitions which are not only too frequent, but which should never occur—one of those assaults upon liberties which are guaranteed by the organic laws of state and nation? We cannot say what the jury might have decided in these respects. Therefore we must hold that the error of the trial court, in depriving the trial body of its duty to pass upon the manner in which the confessions were procured, cut deeply into the rights of appellants and worked a material injury to their defense, in the single feature of the cause which is now under examination. Therefore, also, as we have remarked in disposing of another point, the confessions can be considered by us in no phase of the appeal.

We are now to inquire into the effect of the errors of the trial court upon the disposition of the appeal, in the light of the provisions of section $4\frac{1}{2}$ of article VI. This inquiry involves a statement of the evidence against appellants under but two of the counts, as we have already made disposition of the Fares count. And we must first marshal certain aspects of the evidence which apply generally to the two

counts which are yet under consideration. There was ample evidence that both the Solomon and the Tarter premises were burglarized by means of explosives. The *corpus delicti* was undoubtedly proven. The question in the cause is as to whether appellants were the perpetrators of the offenses. The police officers first came in actual contact with appellants at an apartment house outside the business district of Los Angeles, in which city the crimes were committed. The two, in a conversation held at the apartment house, admitted that they lived at a hotel in the business district. To this hotel the officers soon proceeded and entered the room of appellants. Black came to the room while they were ransacking it. The officers found, as a result of their search, three bottles of nitroglycerine and some burglars' tools. While France was in jail, and after the confessions had been signed, he penned a letter to his sweetheart and handed it to a police officer for deposit in the mails. The officer apparently did not scruple to open the missive, for he at once did so, and he kept it for use at the trial, where it was introduced in evidence. The letter, which was of some length, contained the following: ". . . It's all my own fault why I'm in here. . . . I should have quit when you asked me to, honey. . . . I am glad they got me before I had murder or something worse against me. I have too much against me already. . . . I told them every job I ever pulled, so they can't get me for another one when I get out. . . . I found it doesn't pay to try and beat the law. They get you in the long run. . . . I feel sorry for Jack. But anyone that ever went with me, went on his own free will. . . . I don't feel that I was to blame for him being in this predicament. . . ."

Before we proceed to state the evidence which relates more specifically to each of the two counts, let us view for a moment this evidence which applies generally to both. Let us consider what arguments might have arisen in the minds of the jurors as to its various items. The possession of the nitroglycerine and the burglars' tools, while proper to be viewed as a circumstance in determining the guilt or innocence of appellants in the present cause, might have been considered by the jury as reflecting only upon the general bad character of appellants, the view that the jury took of this evidence depending largely upon the manner in which

its members applied the entire evidence. The letter to France's sweetheart was of course not evidence against Black, but in considering it as against the former, some question as to its applicability may have arisen in the minds of the jurors. The expressions in the letter were all of a very .general character. It cannot be said that they referred to any of the three charges involved here, much less to all three, except in connection with the confessions, and to them we may not look. The expressions admitted a guilt upon no particular charge, and are therefore without weight here. If, however, we go so far as to ascribe some weight to them, or grant grudgingly that the jury might have given them weight, to what extent were they inspired by the fact that France's confession had already been signed? Did the writer foresee that his letter might possibly be purloined by a zealous police officer, and for that reason continue to "make good" under the confession by inserting the above quoted expressions as he wrote the long letter to his sweetheart? What figure did the admissions cut in a possible attempt to avoid extradition· to New Mexico on a murder charge? We do not say how these various questions, arising from the general evidence, should have been answered. It is not within our province to do so. The question is: How would the jury have resolved them, if we grant, which we really need not grant, that they had weight at all?

We turn now to the evidence bearing more specifically upon the Solomon count. There was really none which pointed toward appellants. The testimony concerning the room in the hotel which was above Solomon's store and concerning the orifice which was cut in the floor did not affect appellants. There was nothing shown which connected either of them with the crime through that evidence. Jack Brown was the only person toward whom it pointed, and it pointed toward him most directly. Under the Solomon count it is practically certain that the conviction resulted through the errors of the trial court. In addition to the weight which the jury was bound to ascribe to the confessions in considering that count, under the erroneous instructions of the judge, there is yet the incorrect attitude which he adopted toward the refusal of Brown to testify. Under the rulings made in that behalf, what inferences did the jury draw against appellants? It is practically certain that

they drew some inferences under the court's direction, considering all the circumstances surrounding the attempt to examine Brown, the length of the examination and the nature of the questions propounded to him being especially noteworthy. We do not regard the general evidence above stated, as applying to both the Solomon and the Tarter counts, as sufficient to put into operation the saving grace of section 4½ of article VI, when considering the former count.

[11] We now come to a more specific consideration of the Tarter count, under which was presented evidence against appellants of a more damaging character than that produced under either the Solomon count or the Fares count. The room in which appellants lived and in which the officers found the nitroglycerine and burglars' tools was occupied by appellants at the time when the Tarter burglary was committed. The entry into the Tarter premises was effected by means of a skylight in the roof over the place and this roof was accessible through a window of a toilet in the hotel in which appellants had their room. The Tarter place was a jewelry store, and the owner, when on the witness-stand, described certain watches and many articles of adornment which were taken from his stock by the burglars. Similar articles of jewelry were found by the officers in the room occupied by appellants at the time when the nitroglycerine and burglars' tools were located, and several watches were at that time taken from the person of Black, for it was then that he was arrested and searched. Tarter was put on the witness-stand for the purpose of identifying the various articles of jewelry and watches. He said as to one of the watches that it was identical with one which had been taken. In the same manner he referred to a watch-chain with a penknife attached. He said of a certain belt buckle that "it looks just exactly as those we have in stock, or did have in stock." He testified concerning another belt buckle that "this is just like the one, as near as I can remember, as the one we missed from the store." He said of some cuff-buttons that they were "just the same exactly" as some he had in stock before the burglary and missed afterward. He also said that certain studs were identical with some he had lost. Tarter visited the jail after France's arrest and had a conversation with that individual. This event was also after the confessions had been signed, and we have for

that reason excluded the conversation from our consideration. During its progress, however, France took from his person a belt buckle and handed it to Tarter, by whom it was retained. This buckle was introduced in evidence and was positively identified by Tarter, by means of certain marks upon it, as one which had been taken by the burglars.

Without reviewing this array of undisputed evidence in detail, it appears to us that its character was such that the jury could not have done otherwise than convict appellants upon the Tarter count. We think that result would have been attained if the errors of the court had not been committed. We think appellants would have been convicted on the Tarter count if the jury had not considered the confessions and if they had drawn no inferences against appellants because of Jack Brown's refusal to testify. It is true that Tarter did not identify completely the stolen property, except in the instance of the belt buckle surrendered by France, but his very general identification, relating, as it did, to so many articles, must necessarily have convinced the jury that the property was that which was taken from his store. It is improbable that appellants could have been in possession of so many articles exactly similar to those taken from Tarter's place of business unless they were a part of those actually so taken. It is true, also, that the possession of stolen property is not alone evidence of guilt, but we do not pause to cite authority to the effect that such possession, when attended by corroborating circumstances, is weighty evidence of guilt. Those corroborating circumstances are here present, as the above recital will witness, and they are themselves of considerable weight. We are of the opinion that the Tarter conviction must stand, despite the errors of the trial court.

[12] In closing, we feel impelled to direct the attention of district attorneys and trial judges to the frequent occasion which is thrust upon us to save judgments of conviction by means of the provisions of section 4½ of article VI of the constitution. It seems evident that the prosecutors of the state, and possible that the trial judges, are conducting criminal cases with an eye to the saving grace of the section. It should be manifest that such a course is improper. In the performance of their respective duties incident to trials, the existence of the section is of no con-

cern to those officers. That part of the organic law of the state is of interest, so far as its application is concerned, if we except proceedings on motion for a new trial (see *People* v. *Tomsky,* 20 Cal. App. 672 [130 Pac. 184]), only to the courts of review. District attorneys and trial judges should conduct the trial of criminal cases exactly as if the section did not exist. Such a course, if faithfully and diligently pursued, will lessen the number of appeals, will shorten the time necessary for the consideration of appeals which are taken, will lessen the number of retrials by superior courts, and will conduce to the general dispatch of business in both trial and appellate courts.

The judgment and order under the first and third counts of the information are reversed. The judgment and order under the second count are affirmed.

Finlayson, P. J., and Craig, J., concurred.