[Crim. No. 394.    Department Two.—September 10, 1898.]

THE PEOPLE, Respondent, v. W. W. MILLER, Appellant.

CRIMINAL LAW—LIBEL—OWNERSHIP OF PAPER—EVIDENCE—ADMISSIONS—SUPPORT OF VERDICT.—Upon the trial of a charge of criminal libel, the oral admissions of the defendant as to his ownership of the paper which published the libel, and also a lease to him and another person jointly, designated as publishers thereof, and signed by the defendant, are admissible, as tending to prove his ownership, in whole or in part, and are sufficient proof thereof to sustain the verdict of the jury against him, notwithstanding conflicting evidence to the contrary.   .

ID.—CORPUS DELICTI—CONFESSION—ESSENCE OF LIBEL.—The editorship or proprietorship of the paper publishing the libel does not constitute the *corpus delicti;* and the acts and admissions of the defendant relative thereto do not constitute, in legal contemplation, a confession of the crime of libel, the essence of which is the malicious publication of the libelous language.

ID.—EFFECT OF ADMISSIONS—EVIDENCE OF GUILT.—The guilt of a defendant cannot be proved by his confession or admissions only; but admissions of the defendant, not amounting to a confession

of guilt, are not to be rejected because they may, when connected with other facts proved, tend to establish his guilt.

ID.—VENUE—PROOF OF CIRCULATION OF PAPER.—The venue of the offense of libel in the county in which the persons libeled resided at the time of its alleged publication is conferred by section 9 of article I of the constitution. It may be shown that the paper was circulated in that county, though published elsewhere; and the means by which it became circulated therein are immaterial. It need not be shown that the defendant circulated it, or caused it to be circulated, in the county of the venue.

ID.—LIABILITY OF PUBLISHER.—It is sufficient to establish the liability of the publisher of the libelous paper to show that he had control and management thereof, and knowingly allowed the paper to have any circulation which exposed it to be seen and read by other persons; and he is responsible thereafter for its publication, wherever it found its way. It need not appear that he personally wrote or printed the libelous article, or circulated it by his personal direction.

ID.—EVIDENCE—UNDERSTANDING OF WITNESS AS TO LANGUAGE USED—WAIVER OF OBJECTION.—Where objection to a previous question asked of a witness, as to his understanding of the libelous language used in relation to the persons libeled, had been overruled, and the question was reframed so as to ask as to his understanding of the language used, without reference to particular persons, and was answered without objection, the opposite party cannot afterward object to the answer given.

APPEAL—ABSENCE OF EXCEPTIONS.—Rulings not shown by the record to have been excepted to cannot be considered upon appeal.

APPEAL from a judgment of the Superior Court of Santa Clara County and from an order denying a new trial. W. G. Lorigan, Judge.

The facts are stated in the opinion.

H. V. Morehouse, F. J. Hambley, and Knight & Heggerty, for Appellant.

W. F. Fitzgerald, Attorney General, and C. N. Post, Deputy Attorney General, for Respondent.

CHIPMAN, C.—Defendant was informed against in the county of Santa Clara for the crime of libel alleged to have been committed December 5, 1896, and was by the jury convicted. Judgment was accordingly entered, and the defendant was sentenced to be imprisoned in the county jail for the term of one year. Defendant appeals from this judgment and from the or-

der denying motion for new trial. The charge was that defend-
ant being the "author, editor, and proprietor of a newspaper
. . . . called . . . . 'the Illustrated World,' . . . . printed in
the city and county of San Francisco, and published and circu-
lated in said city and county and circulated in said county of
Santa Clara, upon Saturday of each week; . . . . in one of the
regular weekly issues of said paper, did willfully and maliciously
print, . . . . publish and circulate . . . . the following mali-·
cious defamation . . . . to wit: 'If the conversations of Chas.
W—t and Judge R. could be heard, how much crooked work
would it reveal?' 'Would it not be well for those having cases
before the judge to employ attorney W—t?' " It was alleged that
the terms and names "Judge R" and "the judge" meant, and
were intended to mean and were by the public understood to
mean and refer to, Judge John Reynolds, who was . . . . su-
perior judge of the superior court for Santa Clara county; and
the terms "Chas. W—t" and "attorney W—t" . . . . were in-
tended by defendant to mean and were by the public un-
derstood to mean and refer to Charles Wright, who was
then and there a reputable attorney at law, a practitioner in
said county." It is averred that the language was intended to
mean and was understood by the public as charging that "said
superior judge John Reynolds was dishonest and corrupt in his·
office as such superior judge, and that in concert with said attor-
ney at law, Charles Wright, he, the said John Reynolds, as supe-
rior judge, did connive to defraud and cheat by dishonorable
means those litigants that came before him in the trial of causes,
and . . . . was led and guided, against the law and in conflict
with justice, to decide causes in his, said Reynolds', control in
favor of said attorney, Charles Wright." Allegations follow that
the publication was false and malicious and tended to impeach
the integrity of the judge and thereby expose him to public con-
tempt, et cetera. The sufficiency of the information is not ques-
tioned; nor that the language published was libelous; nor that it
was published in Santa Clara county concerning the persons
named at the time charged. Evidence upon these points need
not, therefore, be noticed.

1. It is contended by defendant that the *corpus delicti* in this
case was either that he was editor, proprietor, or publisher of

the "Illustrated World"; that there is no proof of the *corpus delicti* except the admissions of defendant; and that it cannot be established by extrajudicial admissions or statements.   Counsel's position seems to be that a confession includes more than an admission, and that if by the former the *corpus delicti* cannot be established neither can it be by the latter.   We cannot regard the editorship or proprietorship of the newspaper as the *corpus delicti* in this case.   The essence of the crime is the malicious publication of the libelous language and does not necessarily lie in the authorship of the article or the ownership of the press that prints it.   But even if these facts enter into the question of guilt it does not follow that an admission of ownership would be a confession of the crime.   The acts and admissions of the defendant tending to show that he was the proprietor, either in himself or jointly with some other person, are not confessions in legal contemplation.

The law makes a wide distinction between confessions and admissions.   This was pointed out in *People v. Strong*, 30 Cal. 151.   "A confession in criminal law is the voluntary declaration made by a person who has committed a crime or misdemeanor, to another, of the agency or participation he had in the same. The word 'confessions' is not the mere equivalent of the words 'statements or declarations.'"   The term "confessions" is restricted to acknowledgments of guilt.   (1 Greenleaf on Evidence, 170.)   This court said in *People v. Parton*, 49 Cal. 632: "An admission of a fact, not in itself involving criminal intent, is not to be rejected as evidence (without the preliminary proof) merely because it may, when connected with other facts, tend to establish guilt."   (See *People v. Le Roy*, 65 Cal. 613.)

The alleged libel was published December 5, 1896, in the "Illustrated World."   It appeared from the evidence that this was a weekly journal published at 623 Montgomery street, San Francisco, and was circulated in Santa Clara county.   The article in question was read in Santa Clara county by several witnesses on the day of the issue and soon thereafter.   The heading of the article read: "What our country friends would like to know," and under the subhead "San Jose" appeared the alleged libelous publication.   The witness Bishop, who had read the article, in reply to the question, "State what you understood by it in refer-

ence to any person," answered: "I understood by the use of the word 'crookedness' that if anybody should have a case that was to come before Judge R. it would be to his interest to employ Mr. Chas. W——t, because he would probably get the best of it when it came to the trial. . . . . I understood by the language and the word 'crookedness' that if Mr. Wright, or the attorney mentioned in his paper, and some other attorney were to have a case on trial before the judge, that the opposite counsel would not get a fair shake; that if there was any possible way for him to decide it in favor of Mr. C. D. W——t, why he would do it. . . . . I understood the words, 'would it not be well for those having cases before the judge to employ attorney W——t,' to mean, that if a man wanted to win that had a case to come up before the judge mentioned, that he better employ the attorney mentioned. I gave it no other meaning." The witness Macaran testified to the same effect. Judge Reynolds testified: "I never had any conversation with Mr. Wright that I would not be perfectly willing to have anybody hear, while I was on the bench, in reference to any business matters; there was nothing venal or corrupt or crooked either contained in or alluded to in conversations, or existing in fact, between us."

The question of fact chiefly discussed by counsel is, whether the evidence showed that defendant was the editor or proprietor or publisher of the paper; and it is insisted that he was not shown to have had any business connection whatever with the paper, but that the sole owner, editor, and proprietor was one A. S. Burroughs. A lease of the premises, 623 Montgomery street, San Francisco, where the paper was published, executed by defendant and Burroughs July 23, 1896, and by the trustees of the Floyd estate, was in evidence. In it Burroughs and defendant were described as "proprietors of the 'Illustrated World Publishing Company,' of the city and county of San Francisco, state of California, parties of the second part." The lease was "for the term of twelve months from the tenth day of August, 1896."

It contained the following provision: "And said parties of the second part will use and employ said premises solely for the purpose of their business as publishers of the Illustrated World Publishing Company." The evidence is that Burroughs and defendant both signed the lease as the parties of the second part.

John Duckel was pressman for Francis-Valentine Company, in San Francisco, December 5, 1896. He was shown a copy of the paper of that date. He testified that either he or the assistant foreman did the work of printing it; it was done under witness' directions; he received the forms from the "World" office on Montgomery street; delivered the edition when printed to Buswell Company, binders; the Francis-Valentine Company printed the "Illustrated World" a couple of years for Bartlett, and about a year for Miller; was printing it for defendant Miller on December 5, 1896; sometimes received orders from defendant and sometimes another person. On cross-examination he testified: "I should judge that I printed it for Miller, from the way he talked when he came down about the forms. He would come down and want to know why it wasn't printed in red this week. He would want it red one week, and then again he would want it in purple, and of course he talked about my paper." Witness did not see Burroughs at those times. "I have no knowledge that Miller was the proprietor of that paper, other than that he came down and said it was 'my paper.' . . . . I am positive I had a conversation with Mr. Miller in reference to his saying that this was his paper, prior to December 24, 1896. I cannot state the positive date of this conversation. It was both before and after the fifth day of December." Witness Buswell testified that his business was that of binding and mailing newspapers. He bound the issue of December 5th; he delivered some papers to the News Company December 5th; he first met defendant in July, August or September, 1896; he was introduced to witness by some of the "World" people as the new proprietor who said his orders were to be followed; he thought Mr. Burroughs introduced him; he was asked if he did not know that Burroughs was the editor and proprietor from July, 1896, to January, 1897. "A. As a positive fact, I always understood Mr. Miller was. Q. By what did you understand it? A. By what Miller told me. Q. What did Mr. Miller tell you? A. He told me he bought the paper. Q. When was that? A. In July, August, or September, 1896. I understood that Mr. Miller was the proprietor of the paper from July, 1896, to January, 1897. He told me he bought the paper. That was in July, August, or September, 1896." Witness Watson, of the San Francisco News Company,

testified that his business was handling and distributing papers, weeklies and monthlies; he testified: "We handled the edition of the 'World' of December 5, 1896; I know Byron Millard, of San Jose; he is one of our regular customers; Mr. Millard got ten copies of the 'Illustrated World' of date December 5, 1896, from our company; these papers came from Buswell's bindery to our office. I understood that W. W. Miller did the business of the 'World' with our company during December, 1896." Witness settled with the "World" January 7, 1897, and gave in evidence a receipt signed by Miller of that date for forty-seven dollars and fifty-three cents, balance due "Illustrated World" at that time. Witness Walmer was bookkeeper of Francis-Valentine Company on December 5, 1896. He testified that they commenced to print the "Illustrated World" on May 30, 1896, and ceased on April 6, 1897. There was an interval of a month between December 24, 1896, and January 26, 1897; he never talked with defendant about printing the paper, but did talk with him about the payment of the bills; that he came about once a week, sometimes not for two weeks; he was not positive as to the dates when Miller spoke to him, and could not fix a date before December 5th; Miller ordered some postal cards printed on December 17, 1896, and witness said he thought they related to the business of the "World." Rosalio Salmon testified for defendant that he was foreman of the "Illustrated World" from March, 1896; Burroughs became proprietor about July 6, 1896, and he continued his proprietorship the rest of the year—witness said—"I only know from what he told me that he was proprietor of the paper on the fourth, fifth, and sixth days of December, 1896; he ran the paper up to the end of the year; Mr. Miller then appeared as proprietor about the first of the year 1897: I received all my orders from the beginning of the 6th of July, 1896, up to and including fifth day of December, for making up the paper, cuts and everything, from Mr. Burroughs; I received them from him alone, for I recognized him as the only person authorized to give me orders; . . . . Mr. Miller was at the office occasionally between July and December; I didn't know who he was; I knew him as Mr. Miller for about three months; he gave me no orders between July and December; he was not recognized by any of the em-

ployees of the paper as the manager, editor, or proprietor; I suppose he had a friendly interest toward Mr. Burroughs, and that is why he was around there." Witness A. S. Burroughs for the defense testified very positively that he was the sole and only proprietor, editor, and manager of the paper from July to January, and that defendant had no interest in or connection with it whatever. Upon cross-examination he testified that he was convicted in the federal court of Los Angeles in 1889 for mailing an improper letter and was sentenced to two years in San Quentin and served out his time. He also testified that he was convicted of the crime of forgery in Napa county, and that he had passed under the name of W. W. Wyman while there. No other witnesses were called for defendant.

We have given substantially all the evidence in the case for the reason that it is earnestly contended that there is nothing in any way tending to establish defendant's guilt except his own admissions, and that he cannot be convicted on these alone; and, furthermore, that the positive undisputed evidence of Salmon and Burroughs is that defendant had no interest whatever in the paper on December 5th, and took no part in its management. It is manifest, we think, that the facts, in their nature admissions tending to show that defendant had an interest in the paper as proprietor or manager, do not come within the category of confessions as understood in criminal law. The lease is, in itself, strong evidence that defendant was a proprietor with Burroughs, for he therein so describes himself, and he agrees over his own signature that they "will use and employ said premises as publishers of the 'Illustrated World' Publishing Company." The admission made by defendant in this lease was not of a fact in itself involving criminal intent. There was nothing in the admission which showed an intention to engage in the publication of a paper containing libelous charges against reputable citizens, and yet the admission was such as, connected with other facts, tended to establish guilt and was admissible. (*People v. Parton, supra.*) And the same may be said of other admissions and conduct in the nature of admissions. They were not confessions of guilt. As to the lease, Burroughs explains why it was signed by defendant, and if his evidence is to be received as conclusive it would appear therefrom that defendant

was wholly blameless for the crime committed, and punishment should fall upon Burroughs and not upon defendant. But the jury did not believe Burroughs, and we cannot say they were wrong in rejecting his evidence. Salmon's evidence tended to show that defendant had no connection with the management of the paper. But he testified that the only way he knew that Burroughs was the editor and proprietor was because nothing was told him to the contrary, and that this was the only way he knew it. He does not appear to have known anything about the lease, nor does he state anything in any wise contradicting the evidence of witnesses as to what defendant did on the outside in the way of manifesting an interest in the paper. We think there was evidence sufficient to support the verdict, and if the jury erred in accepting that which was incriminatory and rejecting that which was exculpatory, it was an error not within our province to correct.

2. It is claimed that the venue was not proved (although it is admitted that the article was published in Santa Clara county) because there is no evidence that defendant published it in Santa Clara county.

Defendant concedes that a person may be prosecuted for libel in any county where the paper is circulated by him or through his agency, but it is claimed that it must be shown that he circulated or caused it to be circulated in the county where the prosecution is conducted. Citing Odgers on Libel, *580, *581, where it is said that: "It is necessary to further prove, in a criminal case, that the prisoner published the libel in the county in which the venue is laid." If defendant means that it must be shown that he took the paper to Santa Clara county and there circulated or caused it to be circulated, or that he must be shown to have directed the paper to be sent there, before he can be convicted, we think he mistakes the law. If defendant, being the proprietor, parted with the immediate custody of the paper in San Francisco under circumstances such as exposed it to be read by other persons, it matters not how it reached San Jose. When he parted with control of the libel, it was deemed to be published, so far as the defendant was concerned, wherever it found its way, unless it passed into the immediate possession and control of the person or persons affected by it. It was not

necessary to show that defendant took the paper or directed it
to be taken to the printers; and again directed it to be taken to
the binders; and afterward directed it to be sent to the News
Company to be mailed to San Jose.   It is sufficient if he is shown
to have had control and management of the paper and parted
with control under circumstances such as implied an intent to
give it circulation.   (Pen. Code, sec. 252.)   The jurisdiction to
try the case in Santa Clara county, though the paper was pub-
lished in the city and county of San Francisco, is given by
article I, sec. 9, of the constitution.   (See *In re Kowalsky,* 73
Cal. 120.)

3. It is claimed that the court erred in overruling defendant's
objection to the question: "Q.   What did you understand by the
language of the paper in relation to Judge Reynolds and Attor-
ney Wright?"   The court overruled the objection and defendant
excepted.   The district attorney thereupon reframed his ques-
tion, the answer to which was on motion of defendant's attorney
stricken out.   The record then shows: "Mr. Beasely (district
attorney)—Don't state to whom you understood it to refer, but
state what you understood by it in reference to any person.   A.
You are trying to get the word 'crookedness'—what it means?
Q.   Yes, that is what I am trying to get at."   The witness then
gave what he understood by the word "crookedness."   Defend-
ants made no objection to the question or answer, and we think
cannot now be heard to object.

4. The next errors assigned (paragraphs IV and V of defend-
ant's brief) cannot be considered because the record fails to
show that defendant took an exception to the ruling.

5. Finally, it is claimed that the evidence is insufficient to
sustain the verdict, because there is no testimony whatever that
the defendant wrote, or printed, or published the article, or was
manager of the paper.

We have already seen that there was evidence sufficient to
justify the jury in finding that defendant was a proprietor of the
paper at the time the libel was published.   It was not necessary
to prove that defendant personally wrote or printed the article,
nor that he with his own hands, or by his personal direction,
circulated it.   It was sufficient upon these points to show that
he knowingly parted with the immediate custody of the paper

containing the libel, under circumstances which exposed it to be read or seen by any other person than himself. (Pen. Code, sec. 252.) It is implied by the verdict that the jury found defendant guilty of doing this, and as there was evidence to support such finding it cannot now be disturbed. (See Odgers on Libel, 157, 158. Townshend on Slander and Libel, sec. 115.)

We advise that the judgment and order be affirmed.

Britt, C., and Belcher, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are affirmed.

McFarland, J., Temple, J., Henshaw, J.

Hearing in Bank denied.