[Crim. No. 1531. In Bank.—October 25, 1910.]

## THE PEOPLE, Respondent, v. MARK A. WILKINS, Appellant.

CRIMINAL LAW—MURDER—EXPERT WITNESS—HYPOTHETICAL QUESTION BASED ON FACTS NOT RE-ENUMERATED.—On a trial for murder alleged to have been caused by the administration of strychnine, a medical witness who had performed the autopsy on the body of the deceased may answer a hypothetical question as to the cause of the death, based upon the facts as found by him at the autopsy, without such facts being re-enumerated in the question, if the facts touching the cause of death, from the outward appearance of the body, were few and simple.

ID.—CONFRONTING DEFENDANT WITH BODY OF DECEASED—ADMISSION OF STATEMENTS OF DEFENDANT—CONFESSIONS—DURESS AND MENACE.— After the arrest of the defendant he was taken handcuffed to the place where the body of the deceased had been found buried in the ground, and after being shown the body in the grave, was asked what he had to say, to which he replied, "Well, I buried her." In response to an inquiry whether he had killed her, he replied that he had not, that she had committed suicide by taking strychnine. *Held,* that the statements of the defendant were not confessions, and were not rendered inadmissible by duress or menace in their procurement.

ID.—EXAMINATION OF EXPERT WITNESS AS TO QUALIFICATION.—Where a medical witness for the prosecution, who had made the analysis of the dead woman's organs and discovered therein strychnine, had qualified upon his preliminary examination as an analytical chemist, and was then given over to the defense for cross-examination touching his qualifications, it was not error, on such cross-examination, to refuse to allow him to testfy as to what he did with such organs.

That was a matter for his examination in chief, after the foundation of his qualification as an expert had been laid, and if a lack of skill or inefficiency was then shown, the defense could have interposed its objection and taken the witness for further cross-examination before the final question going to his expert judgment of the results of his analysis was asked.

ID.—CIRCUMSTANTIAL EVIDENCE—ORDER OF PROOF—PROOF OF CORPUS DELICTI.—In a prosecution for murder, in which the evidence by which it is sought to prove the crime was circumstantial and the facts interwoven, it is proper to admit in evidence the defendant's admissions and facts tending to connect him with the crime, without first proving the *corpus delicti*. In such a case, the order of proof is immaterial, if the facts appear in evidence.

ID.—CORPUS DELICTI—DIRECT EVIDENCE UNNECESSARY.—It is not necessary that the *corpus delicti* should be proved by direct and positive evidence.

ID.—INSTRUCTION AS TO TIME OF DEATH—ASSUMPTION OF KILLING.— On such a prosecution, a general instruction "that to make the killing murder, it is requisite that the party die within a year and a day after the stroke is received," could only be construed by the jury as a declaration of a principle of abstract law, and not as a statement that the death in question was a killing, as against the defense that it was a death by suicide.

ID.—ABSENCE OF MOTIVE—EXPERT EVIDENCE.—In such a prosecution, it is not error to refuse an instruction that the absence of motive was "a circumstance in favor of innocence and should be so considered," or an instruction admonishing the jury "to scrutinize opinion evidence or expert evidence with the utmost care."

APPEAL from a judgment of the Superior Court of the County of Alameda and from an order refusing a new trial. Henry A. Melvin, Judge.

The facts are stated in the opinion of the court.

Hugh J. McIsaac, for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, and Everett J. Brown, District Attorney, for Respondent.

HENSHAW, J.—The defendant was tried and found guilty of murder in the first degree. The death penalty was imposed. He appeals from the judgment and from the order denying his motion for a new trial.

The victim of defendant was a married woman, who had been intrusted by her husband with money arising from the

sale of their business in an eastern state. She came to California with defendant and they lived together as husband and wife. They purchased a place in Elmhurst in Alameda County, where they resided. Mrs. Wilkins, as she was known, was well advanced in pregnancy and looked forward to her confinement in October. Upon a Sunday afternoon of July she was last seen sitting upon the front porch of her residence. Following her disappearance inquiries were made by the neighbors, to whom Wilkins represented that his wife had gone to her mother in Kansas City to await her confinement. About the middle of October he told a neighbor that he had received a telegram from Doctor James in Kansas City calling him there at once. He disappeared for about ten days. Upon his return he announced that he was the father of a baby boy. He represented at first that his wife would return to him in a short time, and later that she was not strong and would not return until the following spring. In truth, the defendant did not go to Kansas City but went to San Francisco. While in San Francisco he formed the acquaintance of a man named Anderson. Anderson and his wife became guests of Wilkins at his Elmhurst home. To the Andersons he said that he had just returned from Kansas City, where he had taken his wife to bury her, she having died in childbirth. To another he represented that his wife had died in Hongkong and that he had brought the body over with him on the steamer. Wilkins then proposed to Mrs. Anderson that she personate his wife in the acknowledgment of a deed to the Elmhurst property in order that he might sell it. When asked by Mrs. Anderson why he did not get a death certificate he made no answer. Suspicion was aroused against Wilkins, a little boy in the neighborhood relating that in July he had peeked through a knot-hole in a barn or shed upon the Wilkins' place, and had seen there a hole like a grave with the earth thrown up on one side. Wilkins was arrested on the twenty-fifth day of November, 1907, and taken to the county jail of Alameda County. There he was interrogated by the district attorney and the sheriff, who told him that they were investigating the reported disappearance of his wife. They asked where his wife was. He said that he had not had a wife for twenty years, that the woman with whom he had been living was not his wife, and that he "supposed she was in the

east somewhere." They asked when she went away and he replied that he had nothing to say. They told him that they were simply investigating the matter of her reported disappearance and that he should be able to aid them a great deal. He still replied that he had nothing to say. Meantime a search of the Elmhurst place was in progress and about eight o'clock in the evening the body of the woman was found in a grave dug in the shed as described by the boy. The defendant was taken to the place handcuffed, and shown the body in the grave, with the interrogatory, "Well, what have you got to say now?" or "What do you think about it?" to which he replied "Well, I buried her." Asked "Did you kill her?" or "Didn't you kill her?" he replied that he had not, that she had committed suicide by taking strychnine. This, of course, was before a post-mortem examination of the body was made. An analytical examination of the contents of the stomach and other organs disclosed the presence of strychnine in more than sufficient quantity to cause death. The body itself, where decomposition had not destroyed the evidence, gave indications of death in convulsions. The right hand was clenched and the tongue protruded from the mouth. These and other matters of suspicion pointing to a death by murder and to the defendant as the criminal were shown before the jury.

The defendant's appeal presents the following matters charged as error:—

1. Doctor Hamlin performed the autopsy, but not the chemical examination of the organs which resulted in the discovery of strychnine. He had previously testified to the protruding tongue and the clenched hand, as being evidence that the woman had died in convulsions, whether caused by criminal means or not of course he did not know. He had also testified to other matters, such as the discovery of the fœtus and its probable age. Evidence had then been introduced touching the presence of strychnine in the organs analyzed. Subsequently he was asked: "If in addition to the facts that you found at the time of performing the autopsy upon this body there was between a third—there should have been between a third and a half grain of strychnine either in the stomach, in the kidneys, in part of the kidneys that you brought to Mr. Benzinger, or in part of the intestines that you brought to Mr. Benzinger or any or all three of these, or in any two of

the three, could you then state the cause of death?" The court overruled the objection to the question and permitted the witness to answer: "Yes, I can. The cause of death under those conditions was strychnine poisoning." The contention is here made that the form of question was improper under the intimations of the Le Doux case (*People* v. *Le Doux,* 155 Cal. 535, [102 Pac. 517]; that it was error to have permitted the witness to answer the hypothetical question upon "the facts that you found at the time of performing the autopsy" without re-enumerating those facts. But this is precisely such a condition as that referred to in the Le Doux case, where the facts touching the cause of death, from the outward appear-ance of the body, were few and simple, and a repetition of them, under the very language of the Le Doux case was not necessary. Appellant objects to the language employed in the question "if there *should have been* between a third and a half grain of strychnine" as not embodying any fact in evidence, and thus making the question purely conjectural and speculative; that the language should have been "if there *was* between a third and a half grain of strychnine." The objection is over-refined. Nobody in reading the language could conceive it to have any other meaning than that which the other phrase conveys.

2. It is urged that the duress and menace involved in taking the defendant handcuffed to his home and there confronting him with the body in the grave were such as to forbid the admission of the statements which he at that time made. Those statements were not confessions and did not therefore come within the rule established in this state, distinguishing between the admissibility of confessions and other statements in the nature of admissions not amounting to confession. (*People* v. *Ramirez,* 56 Cal. 533, [38 Am. Rep. 73]; *People* v. *LeRoy,* 65 Cal. 613, [4 Pac. 649]; *People* v. *Hickman,* 113 Cal. 87, [45 Pac. 175]; *People* v. *Miller,* 122 Cal. 87, [54 Pac. 523]; *People* v. *Weber,* 149 Cal. 325, [86 Pac. 671].) The fact that his admission that he buried the body is a confession of another crime, since under our law the secret burying of the body of a human being is an offense (Stats. 1905, p. 115) has no bearing on the matter. He was not charged with the crime of secretly burying the body, and his admission that he buried it was not a confession that he committed murder.

To the contrary, at that time and in that conversation he denied this crime, stating that the woman had committed suicide by taking strychnine.

3. Upon his preliminary examination Richard Benzinger, who made the analysis of the dead woman's organs and discovered therein strychnine, qualified himself as an analytical chemist, and was given over to the defense for cross-examination touching these qualifications. In the course of that cross-examination he was asked: "State what you received and exactly what you did with it?" ("it" meaning the organs of the dead woman). Objection was interposed and sustained. It is insisted that this unduly curtailed the cross-examination, in that there might have been disclosed by the witness's description of the methods which he employed, his lack of knowledge and skill as an expert. The complaint is not just. The defendant was allowed to carry the witness through an elaborate cross-examination touching the general methods, their number and kind, for the discovery of strychnine, and he was examined particularly as to the methods which he employed for this purpose. What he did in the particular instance was matter for his examination in chief after the foundation of his qualifications as an expert had been laid. If his examination in chief upon this matter disclosed lack of skill or inefficiency, which in the opinion of defendant's counsel established that he was not qualified as an expert, the defense could have interposed its objection and taken the witness for further cross-examination before the final question going to his expert judgment of the results of his analysis was asked. (*People* v. *Hawes*, 98 Cal. 651, [33 Pac. 791].)

4. A bottle, proved to contain strychnine, was found in the home of the defendant, and produced in evidence. Its identity and integrity were both sufficiently established to justify its admission in evidence.

5. Complaint is made that admissions and facts tending to connect the defendant with the alleged crime were admitted without proof of the *corpus delicti*. This is a complaint which goes rather to the order of proof than to its sufficiency, and in a case such as this, the order of proof being within the sound discretion of the court, the evidence by which it is sought to prove the crime being circumstantial, and the facts interwoven, made it not only proper but even necessary that

the proof should be given as it was. "The order of proof, however, is of no consequence, if the facts appear in evidence in the case." (*People* v. *Jones,* 31 Cal. 565; *People* v. *Ward,* 141 Cal. 628, [75 Pac. 306]; *People* v. *Donnolly,* 143 Cal. 398, [77 Pac. 177].) And as to the sufficiency of the proof in this case it is needful only to cite, *People* v. *Simonsen,* 107 Cal. 346, [40 Pac. 440]; *People* v. *Alviso,* 55 Cal. 233; *Carroll* v. *People,* 136 Ill. 463, [27 N. E. 18]; *People* v. *Harris,* 136 N. Y. 428, [33 N. E. 65]; 3 Rice on Evidence, 465, 466, where it is said: "Nor is it necessary that the *corpus delicti* should be proved by direct and positive evidence. It would be most unreasonable to require such evidence. Crimes, and especially those of the worst kinds, are naturally committed at chosen times, and in darkness and secrecy; and human tribunals must act upon such indications as the circumstances of the case present or admit, or society must be broken up. Nor is it very often that adequate evidence is not afforded by the attendant and surrounding facts, to remove all mystery and to afford such a reasonable degree of certainty as men are daily accustomed to regard as sufficient in the most important concerns of life; to expect more would be equally needless and absurd."

6. Complaint is made of a general instruction beginning: "Gentlemen of the jury, I instruct you that to make the killing murder, it is requisite that the party die within a year and a day after the stroke is received," etc. It is said that the use of article *the* vitiates this instruction, since it tells the jury that there was a killing,—against the defense that the death was by suicide. Manifestly the instruction was meant, and would be understood by the jury, to be but a declaration of a principle of abstract law. Like complaint, that the instruction assumed the *corpus delicti,* was made in *People* v. *Ramirez,* 56 Cal. 533, [38 Am. Rep. 73]; *People* v. *Chun Heong,* 86 Cal. 333, [24 Pac. 1021]; and in *People* v. *Besold,* 154 Cal. 363, [97 Pac. 874], and in each of those cases the criticism was declared unwarranted. It is so here.

7. The court refused to give an instruction to the effect that the absence of motive was a "circumstance in favor of innocence and should be so considered by you." In *People* v. *Glaze,* 139 Cal. 163, [72 Pac. 965], the trial court refused to give a similar instruction, and this court declared that its refusal was justified in that it was an instruction with respect

to a matter of evidence, and "as such the court was not bound to give it. While an instruction of this character may be and usually is harmless if given, it is not error to refuse it."

8. The court likewise refused to give an instruction proposed by the defense, admonishing the jury "to scrutinize opinion evidence or expert evidence with the utmost care." The refusal was not error. (*People* v. *Smith,* 106 Cal. 73, [39 Pac. 40]; *Estate of Blake,* 136 Cal. 311, [89 Am. St. Rep. 135, 68 Pac. 827]; *Nelson* v. *Nelson-Bennett Co.,* 31 Wash. 116, [71 Pac. 749].)

No other asserted errors are called to our attention on this appeal.

For the foregoing reasons the judgment and order appealed from are affirmed.

Lorigan, J., Angellotti, J., Shaw, J., and Sloss, J., concurred.