[Crim. No. 364. Fourth Appellate District.—August 25, 1938.]

THE PEOPLE, Respondent, v. THOMAS CROWL, Appellant.

Archie M. Hall and Wardell D. Evans for Appellant.

U. S. Webb, Attorney-General, and John L. Nourse, Deputy Attorney-General, for Respondent.

MARKS, J.—This is an appeal from a judgment pronounced on defendant after a jury had found him guilty of robbery in the first degree, and from the order denying his motion for new trial.

Defendant and his nephew, Lloyd Crowl, were arrested for the robbery of C. M. Johnson, committed on February 3, 1938, on the highway leading from Needles to San Bernardino. Lloyd Crowl was a minor of the age of sixteen years. He was certified to the juvenile court and was not made a defendant in this action.

Defendant relies upon the following grounds for reversal of the judgment: (1) That the evidence was insufficient to justify the verdict and judgment; (2) errors in law in sustaining objections to questions propounded to witnesses; (3) errors in instructions given and proposed instructions refused; (4) misconduct of the district attorney; (5) error in refusing to grant the motion for new trial because of newly discovered evidence.

Lloyd Crowl was called as a witness for the People. His evidence was in direct conflict with that of the complaining witness and that of defendant. It is quite apparent that neither Lloyd Crowl nor defendant confined himself to the exact truth in the evidence he gave before the jury.

The first specification of error is divided into three sections: (a) That the testimony of Lloyd Crowl is so untrue that the conviction should not be permitted to stand because it is supported by false evidence; (b) that defendant was so intoxicated as to be unconscious during the commission of the crime and did not know that a robbery had been committed until the next day; (c) that it was not shown that a dangerous or deadly weapon was used to bring the offense within the definition of robbery in the first degree. (Sec. 211a, Pen. Code.)

C. M. Johnson testified that on the night of February 3, 1938, he was walking from Needles to Los Angeles. When he was about six or seven miles west of Needles an automobile traveling west passed him. It was driven several hundred feet beyond him when it was turned and driven back to

where he was standing. The driver of the car, whom he identified as Lloyd Crowl, alighted, went to the back of the automobile and secured a rolled up kit of automobile tools with which he hit Johnson twice, once on the temple cutting his scalp and once on the jaw, dislocating it. A fight ensued in which defendant took part. Johnson was badly beaten by the two men. They took his clothes from him and carried away a wallet or bill fold, a watch and chain and $4.63 in money. After defendant was arrested he secured and returned the stolen watch which had been hidden in a pump house in Amboy where Lloyd Crowl lived and where defendant was then staying.

The arresting officer had a conversation with defendant. Johnson described portions of this conversation as follows:

"Q. Do you recall what he said to them or what they said to him? A. Well at first he said he hadn't anything to do with it and sort of laughed it off, and finally Mr. Oxnevad convinced him from the evidence against him that he was connected with it, and finally he admitted he did. Q. When he admitted he did, do you recall definitely what he said? A. No, I don't, not the exact words. Q. If you don't recall the exact words can you give the substance or drift or effect of what he said? A. No, I don't believe I can recall exactly what he said, other than he admitted that he had. Q. Admitted that he had what? A. Had been a part of it. Q. A part of what? A. Of the robbery. Q. On that occasion, that is on that trip to Amboy did you see or was there shown to you any of the articles that you had lost at the time of the robbery? A. Yes, the watch. Q. Who had the watch when you saw it? A. After Mr. Oxnevad had convinced him that he was a part of that he admitted that he was, and said that the watch was hidden in a place there at Amboy. . . . Q. Did you have a conversation with him on that day or did the officers in your presence have a conversation with him, about the other pieces or parcels of property you lost, that is the wallet or stickpins or pen or pencil, any of those things? A. He said they had thrown the wallet away and he didn't know anything about the other articles. Q. Did he say where they were when they threw the wallet away? A. He said some place along the roadside. . . . Q. Now I believe you were unable to remember just what words Mr. Crowl used when you say he admitted he had been a part of it.

Has your memory been refreshed since that so as to tell the court and the jury just how Mr. Crowl expressed himself? A. In regard to what? Q. In regard to what Mr. Oxnevad had said. A. The only thing he said he assumed the blame and told them where the watch was. Q. He said to the officers that he would assume the blame? A. Yes. Q. And at the same time told them where the watch had been hid? A. Yes, assumed the blame for the whole thing."

Lloyd Crowl was a witness for the People. His testimony closely folowed that of Johnson as to the actual happenings at the time of the robbery, except that Lloyd maintained that defendant was the driver of the automobile and the one who started the fight, made the assault with the kit of tools, and took the property off Johnson's person.

Defendant testified that he had been drinking heavily on the night of the robbery; that he remembered leaving a roadhouse called "Myra's" in Lloyd's automobile and knew nothing more until he was awakened by the noise of the fight between Lloyd and Johnson; that he alighted from the passenger's seat of the car and took part in the scuffle; that in a few moments he became sick and returned to the car where he fell asleep again; that he knew nothing of the robbery until the next day.

Unless the testimony of the defendant be accepted as true in its entirety, the evidence is ample to support the verdict and judgment. According to Johnson's testimony, defendant aided and abetted in the commission of the crime although he did not strike the blows with the rolled up kit of automobile tools. He was, therefore, a principal in the commission of the crime and punishable as such. (Sec. 31, Pen. Code.) If the testimony of Lloyd Crowl be believed, defendant was the principal actor in the robbery and guilty of the crime.

It is true that one or the other of these witnesses must have been mistaken, but the testimony of either of them was sufficient to hold defendant as a principal in the commission of the crime. Conflicts in the evidence are first addressed to, and resolved by, the jury. We cannot reverse a judgment simply because of conflicts in the evidence or simply because we believe that one of two witnesses for the People was untruthful in part of his testimony.

■ Defendant's real defense was that he was so drunk that he did not know that a crime was committed and was incapable of forming an intent to commit a robbery. The testimony of defendant as to the extent of his intoxication is contradicted by that of two witnesses other than Lloyd Crowl. The testimony of Johnson shows quite clearly that defendant was not as seriously intoxicated as he claimed; that defendant did know what he was doing and did have an intent to rob. The bar keeper at "Myra's" saw defendant shortly before and shortly after the robbery. He talked with defendant and observed him and his conduct. He said that while defendant had been drinking he was not intoxicated. This state of the record produces the familiar situation of conflicts in the evidence which the jury resolved against defendant.

■ Defendant urges that there is not sufficient evidence in the record that a dangerous or deadly weapon was used in the robbery to support the conviction of robbery in the first degree. The only description of the instrument with which Johnson was hit is found in his testimony. He testified that he was hit twice with a "blunt instrument" and that "it looked to me like a rolled up kit of car tools".

"A dangerous or deadly weapon has been frequently described in our authorities as any weapon or instrument which, from the manner that it is used or attempted to be used, is likely to produce death or cause great bodily injury." (*People* v. *O'Neal*, 2 Cal. App. (2d) 551 [38 Pac. (2d) 430].)

Automobiles are in universal use throughout the state. When a new automobile is sold it is equipped with a kit of tools which includes a hammer, wrenches, and other metal instruments. These tools are usually carried in a cloth container. These facts are of such universal knowledge that the expression, "rolled up kit of car tools", needs no special definition. It is a phrase of general use and its accepted meaning is well understood. A blow struck with a hammer and other metal tools rolled up in a cloth container can produce great bodily injury and therefore comes within the definition of a dangerous weapon.

■ The alleged errors of law are found in the trial court's rulings sustaining objections to questions propounded to several witnesses, by counsel for defendant, in an effort to prove that defendant had been offered inducements to make the statements already quoted, and other incriminatory state-

ments made in the office of the district attorney in San Bernardino.

After Johnson had testified on his direct examination to portions of the conversation between the arresting officers and defendant he was asked the following question on cross-examination:

"Mr. Johnson did you at any time in any of these conversations that you have testified concerning between the officers and yourself and Mr. Crowl hear the officers promise any immunity to Mr. Crowl of prosecution on a felony charge if he would plead guilty to a misdemeanor charge and accept 6 months sentence in the county jail?"

An objection to this question on the ground that it was immaterial was sustained. The following question was then asked:

"Did you at any time overhear the officers offer to Mr. Tom Crowl in any of these conversations you have related or you have testified concerning to permit Mr. Crowl to plead guilty of a misdemeanor charge in the Needles justice court if he would assume the entire blame?"

An objection to this question was sustained on the ground it was hearsay and immaterial.

When the arresting officers were on the witness stand the trial court refused to permit counsel for defendant to cross-examine them concerning these conversations with defendant. These rulings were technically correct because they had been asked nothing concerning them on direct examination. Defendant called officer Bland as his witness. During his examination by defendant's counsel the following occurred:

"Q. Did you overhear a conversation which took place between Mr. Oxnevad and Mr. Thomas Crowl in the car after you left Amboy?

"The Court: Answer that 'yes' or 'no'. A. Yes sir. Q. (By Mr. Evans): Will you repeat that conversation?

"Mr. Kavanaugh: Objected to on the ground it is immaterial, and self serving.

"Mr. Evans: If the court please, we offer this on this theory: That there have been statements in the record here as to alleged confessions made by the defendant, Thomas Crowl. We wish to show by this witness and his testimony, as well as the testimony of Mr. Oxnevad, that those confes-

sions were made by Mr. Crowl under a promise of immunity and reward, and they were given prior to the filing of the charges in this case.

"Mr. Kavanaugh: I have not heard any testimony about any confessions at all.

"Mr. Evans: Well, the statements speak for themselves.

"The Court: I think I recall the testimony, counsel. I don't think there are any confessions. There are statements, but not confessions. Objection sustained."

While defendant was a witness in his own behalf his counsel made repeated efforts to draw from him the entire conversation between defendant, the arresting officers and Johnson concerning a part of which Johnson had testified. Objections to these questions were sustained. Like rulings were made when defendant was asked to give his full conversation which occurred in the office of the district attorney. It is clear from the record that defendant would have testified that he made the statements Johnson attributed to him because one of the deputy sheriffs told him in substance that "if you would go back to Needles and plead guilty to an assault and battery charge or simple assault, that it would make it easier for Lloyd and that he would see the judge and do what he could to help you out?" It is also clear that, if permitted to have done so, he would have testified that he had the same inducements in mind when he made the incriminating statements in the office of the district attorney. Defendant denied the truth of these statements while admitting making them.

Section 1854 of the Code of Civil Procedure provides in part as follows: "When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; . . . " (See, also, secs. 2048, Code Civ. Proc., 1102, Pen. Code.)

In the early case of *People* v. *Navis,* 3 Cal. 106, it was held that "Where the admission or confession of a party is resorted to as evidence, it is error to exclude any portion of it made at the same time as the part which is related". With the exception that it is now held that immaterial and irrelevant portions of a conversation which do not relate to or explain the admitted portions need not be received in evidence, the rule announced in *People* v. *Navis, supra,* is still the law in California. (See *People* v. *Murphy,* 39 Cal. 52;

*People* v. *Yeaton,* 75 Cal. 415 [17 Pac. 544]; *Hinton* v. *Welch,* 179 Cal. 463 [177 Pac. 282]; *People* v. *Tugwell,* 28 Cal. App. 348 [152 Pac. 740]; *People* v. *Stevenson,* 103 Cal. App. 82 [284 Pac. 487].) The attorney-general admits that the rulings we are considering were erroneous and to escape the effect of the errors urges the provisions of section 4½ of article VI of the Constitution.

Defendant complains of an instruction on the defense of intoxication which goes somewhat beyond the provisions of section twenty-two of the Penal Code. In it the jury was instructed that evidence of intoxication "may be considered by the jury for the purpose of determining the degree of the crime, and in determining the purpose, motive or intent with which he committed the act, and for this purpose it must be received with great caution". The closing clause of this portion of the instruction has been criticized though held in itself not to be reversible error. (*People* v. *De Moss,* 4 Cal. (2d) 469 [50 Pac. (2d) 1031].)

Defendant requested and the trial judge refused to give an instruction based on section twenty of the Penal Code to the effect that "in every crime or public offense there must exist a union, or joint operation of act and intent, . . . " The substance of this instruction was not elsewhere given.

"Robbery contemplates the stealing of property from the possession of the owner by means of violence, force or fear, with the intention of permanently depriving the owner of his property." (*People* v. *O'Neal,* 2 Cal. App. (2d) 551, at page 561 [38 Pac. (2d) 430].) Where an actual intent is a necessary element of a crime the requested instruction should have been given. (*People* v. *Sheffield,* 108 Cal. App. 721 [293 Pac. 72].) This is especially true where, as here, the only available defense was that of intoxication to a degree making it impossible for defendant to have had any intent to steal. Under such circumstances the failure to give proper instructions on the question of intent becomes serious error. The jury was not fully instructed on the only possible defense presented by the defendant.

Defendant proposed, and requested the trial court to give, the customary instruction on the necessity of a confession being freely and voluntarily made. This request was refused and this ruling is now urged as prejudicial error. No instruction was given on this subject.

This brings us to the question: Is there a confession in the record? The trial judge held that the statements of defendant, to which Johnson testified, did not amount to a confession. The attorney-general attempts to support this conclusion of the trial judge with the mere assertion that the evidence of Johnson concerning these statements does not amount to the recital of a confession, to which he adds the argument that there is nothing in the record to show that the purported confession was not voluntarily given. This last argument brushes aside the very apparent fact that defendant's repeated efforts to introduce evidence to show that the arresting officers gave inducements for the purported confession were rendered abortive by objections of the district attorney, which were erroneously sustained by the trial judge.

As Johnson was permitted to testify to portions of the conversation containing the purported confession, defendant should have been permitted to bring to the attention of the jury all other material portions of the same conversation. If defendant was offered inducements by the arresting officers to make the purported confession, he should have been permitted to prove that fact as it would have had an important bearing on the weight to be given by the jury to the purported confession.

What amounts to the confession, as distinguished from statements against interest, was considered by the Supreme Court in the case of *People* v. *Fowler,* 178 Cal. 657 [174 Pac. 892]. It was there said:

"A confession, in criminal law, is an admission or statement, by a person accused of a crime, to the effect that he is guilty thereof. 'An admission is distinguished from a confession by the fact that the term "admission", in criminal matters, relates to matters of fact that do not involve a criminal intent, and a confession is an acknowledgment of guilt.' (2 Wharton on Criminal Evidence, 10th ed., sec. 622a.) The author goes on to show that the term 'confession' does not include admissions of mere acts of guilty conduct, or of subordinate facts that do not constitute guilt of the offense in question, the reason being that a 'confession' is an 'acknowledgment, in express terms, by a party in a criminal case, of the truth of the crime charged', and that it is only with respect to confessions, thus defined, that the rule pre-

vails that preliminary proof that they were voluntary must be made before they can be admitted in evidence. (Id., sec. 622b.) This doctrine has often been declared and enforced in this state. (*People* v. *Strong,* 30 Cal. 151, 157; *People* v. *Dennis,* 39 Cal. 625, 637; *People* v. *Le Roy,* 65 Cal. 613, 614 [4 Pac. 649]; *People* v. *Hickman,* 113 Cal. 80, 86 [45 Pac. 175]; *People* v. *Ammerman,* 118 Cal. 23, 32 [50 Pac. 15]; *People* v. *Miller,* 122 Cal. 84, 87 [54 Pac. 523]; *People* v. *John,* 144 Cal. 284, 286 [77 Pac. 950]; *People* v. *Weber,* 149 Cal. 325, 339 [86 Pac. 671]; *People* v. *Wilkins,* 158 Cal. 530, 534 [111 Pac. 612].) The matter is well illustrated by the decision in *State* v. *Knowles,* 48 Iowa, 598. Defendant was charged with forgery of a promissory note. Evidence was given that he had admitted that he wrote the name constituting the signature thereon. The court said: 'A confession implies that the matter confessed is a crime, and unless the defendant admitted that he wrote the name of Daniel Slack to the note with a fraudulent intent, his statement is not a confession, because he may have intended by such confession to imply that the act was done rightfully.' Also, in *State* v. *Thomas,* 135 Iowa, 717 [109 N. W. 900], where the defendant was charged with the murder of another by means of poison and had stated that he had given too much of the poison by mistake—the poison being also a medicine—the court said: 'The defendant's statement was not that he had wrongfully or unlawfully or with bad motive administered the poison. The statement itself negatives any unlawful intent, and what is said in regard to the act cannot be separated from the accompanying declaration as to intent, so as to make admission of the act itself a confession of the crime.' (See, also, *State* v. *Abrams,* 131 Iowa, 479, 484 [108 N. W. 1041].) The present case is almost identical with that of *Owens* v. *State,* 130 Ga. 296, 298 [48 S. E. 21]. The defendants were charged with murder, and being confronted with the dead body of deceased, one of them said the deceased was himself to blame, and that 'we had to do it to save ourselves'. It was held that this was not a confession, the court saying: 'Unless the statement of the defendant is broad enough to comprehend every essential element necessary to make out the case against him, it cannot be said to be an admission of guilt. . . . If the main fact is admitted with a qualifying exclusion of a necessary ingredient of the crime charged, the

crime is not confessed. The qualification is a part of the admission, and both must be considered in interpreting the meaning of the statement. It would be manifestly unfair to hold a person legally bound by a statement which admits the commission of an act and in the same breath legally justifies and excuses the same.' "

■ The purported confession to which Johnson testified may be summarized as follows: That defendant admitted that he "had been a part of the robbery"; that defendant stated that he and Lloyd had thrown the stolen wallet away at some place along the roadside; that defendant assumed the blame for the robbery and told the officers where the watch was hidden; that he "assumed the blame for the whole thing"; that after his arrest, he produced the stolen watch and gave it to the arresting officers.

While this testimony, summarizing the conversation between the arresting officers and the defendant, is largely in the form of legal conclusions, the evidence was received without objection or motion to strike and the jury was entitled to consider it as given. When considered as a whole it amounts to a confession within the rules announced in *People* v. *Fowler, supra.* Before making the statements defendant was accused of participating in the robbery. After being so accused, defendant admitted that he had been a party to the robbery; that he and another had possession of the stolen wallet and had thrown it away; that he had sufficient possession of the watch to produce it from its hiding place. He also stated that he took the blame for the entire robbery. These replies to the accusation made admit every necessary element of the crime of which he was accused, including the intent to steal Johnson's property, as the intent to steal may be inferred from the acts which defendant admitted and from the unexplained possession of part of the fruits of the robbery.

We are assisted in reaching this conclusion by the decision in the case of *People* v. *Oliveria,* 127 Cal. 376 [59 Pac. 772]. In that case the defendant admitted, in effect, that "he was guilty of the crime, and that he assisted in forcibly taking the money from Nevis", the party who was robbed. These statements were held to amount to a confession. We cannot distinguish the statements in the Oliveria case from the statements of the defendant in the instant case.

312

■ The record before us presents an unusual situation in that the evidence of the confession was admitted without prior objection on the part of defendant that it was induced by promises of reward. Usually, where a defendant contends that a confession was involuntarily made, objection on that ground is made to its admission in evidence. It then becomes the duty of the trial judge to take evidence, including any offered by the defendant, on the question of the voluntary character of the confession. It is the duty of the trial judge to admit or reject the confession upon the evidence so taken. If it be admitted, the weight to be given to it is a matter to be determined by the jury under proper instructions, if such instructions are requested by the defendant. (*People* v. *Oliveria, supra*; *People* v. *Fowler, supra*; *People* v. *Castello*, 194 Cal. 595 [229 Pac. 855]; *People* v. *Columbus*, 49 Cal. App. 761 [194 Pac. 288]; *People* v. *Black*, 73 Cal. App. 13 [238 Pac. 374]; *People* v. *Dutro*, 75 Cal. App. 138 [242 Pac. 84]; *People* v. *Nelson*, 70 Cal. App. 476 [233 Pac. 406].)

■ It certainly was error for the trial judge to exclude evidence of the defendant that would tend to establish that the confession was not voluntarily given. The question remains—was it error to refuse to give the requested instruction on the effect of an involuntary confession? We think not, as the evidence presented no issue on the involuntary character of the confession. This conclusion renders obvious the serious nature of the error that resulted in the exclusion of the evidence tending to show that inducements were offered defendant to confess.

In *People* v. *Cahill*, 11 Cal. App. 685 [106 Pac. 115], it was held that where a confession was received without objection, that it was not error to exclude proffered testimony showing that the confession was involuntary and was induced by promises of reward. However, in view of the numerous cases already cited, we believe that the rule of the Cahill case, *supra*, should be confined to its own facts and should not be extended to the facts of the instant case where evidence of the involuntary character of the confession, if believed, would have had an important bearing on the weight to be given the confession.

■ We have examined the record carefully and can find no merit in the remaining contentions of defendant, namely, misconduct on the part of the district attorney, and

that a new trial should have been granted because of newly discovered evidence.

In view of the errors in the record, it remains for us to determine the effect to be given them under the provisions of section 4½ of article VI of the Constitution.

In discussing a similar question, in *People* v. *Black, supra,* it was said:

"Can we say that there has not been a miscarriage of justice in the one particular disclosed by the error of the court in excluding from the jury the evidence upon the question whether the confessions were freely and voluntarily made? Can we say that the jury would have been bound under the evidence to reach the same conclusion upon that point as was arrived at by the judge? Can we say that they possibly would not have arrived at that conclusion, upon a just consideration of the evidence upon the subject which is unfolded to us from the cold record? . . .

"It is a law that, when applying the provisions of section 4½ of article VI of the Constitution to an entire cause, we must direct a reversal when we are unable to say 'whether appellant would or would not have been convicted but for the errors of the court'. (*People* v. *Degnen,* 70 Cal. App. 567 [234 Pac. 129].) The same rule is susceptible of an application to the special feature of the present cause which is now under consideration. Can we say whether or not the jury would have decided that the confessions were to be considered if its members had been permitted to pass upon the question whether they were freely and voluntarily made? We certainly cannot say that."

In *People* v. *Taber,* 13 Cal. App. (2d) 27 [55 Pac. (2d) 1189], this court said:

"The question remains whether this error was sufficiently prejudicial to justify a reversal in view of the provisions of section 4½ of article VI of the Constitution. In *People* v. *O'Bryan,* 165 Cal. 55 [130 Pac. 1042], the court said:

" 'On the other hand, we do not understand that the amendment in question was designed to repeal or abrogate the guaranties accorded persons accused of crime by other parts of the same constitution or to overthrow all statutory rules of procedure and evidence in criminal cases. When we speak of administering "justice" in criminal cases, under the English or American system of procedure, we mean something

more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected.'

"In *People* v. *Salaz,* 66 Cal. App. 173 [225 Pac. 777], the court said:

" 'While it is true that section 4½ of article VI of the Constitution confers upon this court the power to weigh, to a limited extent, the entire evidence upon which a conviction was had, still ''we are not substituted for the jury. We are not to determine, as an original inquiry, the question of defendant's guilt or innocence.'' We are to ''decide whether, in our judgment, any error committed *has led* to the verdict which was reached''. (*People* v. *O'Bryan,* 165 Cal. 55 [130 Pac. 1042].) (Italics ours.) And whenever we are unable to determine whether the defendant would have been convicted had erroneously admitted testimony been withheld from the jury's consideration this section of the Constitution cannot be applied to uphold the judgment.'

"In *Tupman* v. *Haberkern,* 208 Cal. 256 [280 Pac. 970], the court said:

" 'Whether the error found to be present ''has resulted in a miscarriage of justice'' presents a question of law on the record before the court, and the purpose of the section was to require the court to declare as matter of law whether the error has affected the substantial rights of the party complaining against it, and not for the purpose of determining the evidentiary value of the testimony or where the preponderance of the evidence lies.' '' (See, also, *People* v. *Romo,* 24 Cal. App. (2d) 119 [74 Pac. (2d) 306]; *People* v. *Morales,* 26 Cal. App. (2d) 442 [79 Pac. (2d) 771].)

The confession of defendant must have had an important bearing on the conclusions reached by the jury. If there was evidence that the confession was made under promises of reward, the jury should have had that evidence before it in order to properly determine the weight to be given to the confession. Defendant's sole defense was that of intoxication, as that condition bore on his intent to commit the crime charged. The failure of the trial court to properly instruct the jury on the question of intent might have had the effect of relieving the jury from serious consideration of that defense.

With these errors in the record, we do not believe that the provisions of section 4½ of article VI of the Constitution should be invoked to sustain the judgment.

The judgment and order denying the motion for a new trial are reversed and a new trial is ordered.

Barnard, P. J., concurred.